SCHUH, Appellant, v. Fox River Tractor Company and another, Respondents.

*No. 308. Argued May 6, 1974.—Decided June 4, 1974.*
(Also reported in 218 N. W. 2d 279.)

730

For the appellant there were briefs by *Kersten & McKinnon* of Milwaukee, attorneys; *Charles D. Clausen* and *George P. Kersten,* both of Milwaukee, and *Dudley O. Emmert* of Manitowoc, of counsel; and oral argument by *George P. Kersten.*

For the respondent there was a brief by *John P. Nash* and *Nash, Spindler, Dean & Grimstad,* all of Manitowoc, and oral argument by *John P. Nash.*

CONNOR T. HANSEN, J. The plaintiff was assisting a neighboring farmer, Gordon J. Kohlbeck, in filling his silo with corn silage at the time he sustained his injury. The silage was brought from the field in a wagon equipped with a conveyor mechanism which transferred the silage from the wagon into the crop blower that blew the silage up into a silo, or in this case onto a pile since the silo had been filled. The crop blower is a machine which utilized an auger mechanism to move the silage from the hopper of the crop blower into its fan housing which contained a fan that thrust or blew the silage into the silo. The top of the hopper portion of the crop blower is practically square. The sides are slanted or tapered inward toward the bottom where an auger is located.

The power take-off mechanism on a tractor was the power source for the auger and the fan on the crop blower. A second tractor would pull a wagon of silage up to the crop blower. The wagon had a conveyor belt or "apron" which carried the silage from the wagon into the hopper of the crop blower. The tractor for the wagon also was equipped with a power take-off assembly which provided the power to activate the conveyor assembly on

the wagon. Thus, the two tractors providing the power to run the crop blower and the conveyor on the wagon were aligned adjacent to and parallel with one another.

Daniel Kiel, another of Gordon J. Kohlbeck's neighbors, owned the crop blower and some other equipment being used in the silo-filling operation. Kiel, George R. Kohlbeck (Gordon's father), and Arthur Vetting, were also assisting in the operation. During the course of the day, the men had experienced mechanical difficulties with the apron or conveyor belt on the wagon. The shaft driving the conveyor belt broke and had to be welded. After the shaft had been repaired, the chain had occasionally slipped off its sprocket during the course of the afternoon, thus stopping the conveyor. Plaintiff testified that each time he put the chain back on the sprocket with the aid of a screwdriver without much difficulty, and while standing on the ground. Shortly after 5 p. m., the conveyor had again malfunctioned. The plaintiff shut off the power take-off from the tractor to the conveyor wagon in order to repair it. He also pulled the clutch lever on the crop blower, which controlled the auger, but did not shut off the power take-off from the tractor to the crop blower. Thus, while the auger of the crop blower stopped, the fan continued to operate. Believing the chain on the wagon conveyor would go back into place by pulling it forward, plaintiff stood on the edge of the hopper of the crop blower and pulled on the chain of the conveyor in an attempt to take up the slack. He slipped from this position and his left leg was entangled in the fan and ultimately was amputated.

Plaintiff had worked with this crop blower for two-and one-half days the previous year, and defendant produced evidence to establish at trial that plaintiff knew, or should have known, that the fan was still running when he pulled the clutch lever. Plaintiff denied that he knew it was still running.

Additional facts will be set forth when considering the issues presented on this appeal.

## *Issues.*

The trial court granted the defendant's motion for a directed verdict for three reasons, any one of which is sufficient to require affirmance on appeal. The three reasons are:

(1) The crop blower was not defectively designed so as to render the defendant liable under strict liability in tort.

(2) The plaintiff was not reasonably using the crop blower for an intended purpose at the time of the injury.

(3) The contributory negligence of the plaintiff was at least equal to or greater than any negligence of the defendant as a matter of law.[1]

The trial court supported its determination by a detailed analysis of the evidence.

We do not deem it necessary to again set forth the standards for a trial court to consider in its determination of a motion for a directed verdict or those of this court on review of decisions on motions for directed verdict.[2]

In *Wallow v. Zupan* (1967), 35 Wis. 2d 195, 198, 150 N. W. 2d 329, it was explained as follows:

". . . A verdict should only be directed against a plaintiff where plaintiff's evidence, giving it the most favor-

[1] Sec. 895.045, Stats., was amended by ch. 47, Laws of 1971, effective June 23, 1971, to permit recovery if the contributory negligence is not greater than the negligence of the party against whom recovery is sought. In the instant case the injury occurred October 5, 1965, and action was commenced September 17, 1968; therefore, sec. 895.045, as amended, is not applicable to this action.

[2] *Phoenix Ins. Co. v. Wisconsin Southern Gas Co.* (1970), 45 Wis. 2d 471, 484, 485, 173 N. W. 2d 610; *Pittman v. Lieffring* (1973), 59 Wis. 2d 52, 61, 207 N. W. 2d 610; *Samson v. Riesing* (1974), 62 Wis. 2d 698, 705, 215 N. W. 2d 662.

able construction it will reasonably bear, is insufficient to sustain a verdict in plaintiff's favor. [Citations omitted.]"

". . . On appeal this court will affirm a directed verdict unless the trial court is clearly wrong. . . ." *Merz v. Old Republic Ins. Co.* (1971), 53 Wis. 2d 47, 56, 191 N. W. 2d 876.

### *Defective manufacture.*

In *Howes v. Hansen* (1972), 56 Wis. 2d 247, 252, 253, 201 N. W. 2d 825, this court further considered the concept of strict liability in tort as it relates to the type of situations which are generally called product liability cases, and stated:

"In *Dippel v. Sciano,* this court adopted the concept of strict liability in tort propounded in the Restatement:
" ' "Sec. 402A. **Special Liability of Seller of Product for Physical Harm to User or Consumer**
" ' "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
" ' "(a) the seller is engaged in the business of selling such a product, and
" ' "(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
" ' "(2) The rule stated in subsection (1) applies although
" ' "(a) the seller has exercised all possible care in the preparation and sale of his product, and
" ' "(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." '
"Strict liability is not absolute liability. Rather, it does aid the plaintiff by relieving him of proving specific acts of negligence and protecting him from the defenses of notice of breach, disclaimer and privity of contract. The plaintiff, according to *Dippel,* must yet prove:

" '. . . (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the *user or consumer*, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the *user* or *consumer* without substantial change in the condition it was when he sold it.' (Emphasis supplied.)

"The concept of strict liability, as spelled out in the Restatement 402A and as adopted by this court in *Dippel,* was explained by Mr. Justice HALLOWS, now chief justice, in his concurring opinion:

" 'What we mean is that a seller who meets the conditions of sec. 402A, Restatement, 2 Torts 2d in Wisconsin is guilty of negligence as a matter of law and such negligence is subject to the ordinary rules of causation and the defense applicable to negligence.' "

In determining whether the plaintiff had presented evidence upon which the jury could conclude that the crop blower was unreasonably dangerous, the testimony of Dr. Norval Wardle and the plaintiff becomes important. Dr. Wardle is an agricultural safety engineer and qualified as an expert witness. He testified that he had closely examined the machine and the manner in which it operated. He also testified that a fundamental rule of agricultural design engineering, which was recognized by the industry when this machine was manufactured, was that a control should be located so as to suggest by its location and by its movement what it would accomplish. It was Dr. Wardle's expert opinion that the location of the clutch lever on the defendant's crop blower was misleading and contrary to this recognized rule. The injured plaintiff testified that he thought by pulling the clutch lever on the defendant's machine he would shut off the entire blower machine, both the auger and

the fan, because the clutch lever was the only lever between the power source (tractor) and the machine.

When the clutch lever was pulled it was obvious that it controlled the auger because that mechanism was in plain sight and came to a stop. The fan, on the other hand, was not readily visible because it was enclosed by the fan housing. The fan would not come to an immediate halt even if the power to it was shut off, but plaintiff said he thought he had given the fan enough time to stop before he had stepped up onto the edge of the hopper. The tractors both continued to operate and according to plaintiff this, and the fact that he was preoccupied with repairing the wagon, prevented him from hearing the fan as it continued to run. The jury was entitled to believe this testimony.

Of the other manufacturers who produced crop blowers, nine had clutch levers which controlled the auger alone. None had clutch levers which controlled the fan. Dr. Wardle testified that all of these other manufacturers located the lever on the auger side of the fan housing, thus suggesting it would control only the auger, in accordance with the design engineering rule he had earlier explained. The expert testimony of Dr. Norval Wardle regarding the standard practice in the industry regarding the location of the clutch lever could be properly considered by the jury in determining whether the design of defendant's crop blower was unreasonably dangerous.

*See: Kalkopf v. Donald Sales & Mfg. Co.* (1967), 33 Wis. 2d 247, 253, 147 N. W. 2d 277; *Raim v. Ventura* (1962), 16 Wis. 2d 67, 72, 113 N. W. 2d 827; and *Hipke v. Industrial Comm.* (1952), 261 Wis. 226, 232, 52 N. W. 2d 401.

Eugene Sousek was project engineer for the defendant between 1960 and 1963, and he testified that the clutch lever on the crop blower was placed as it was so that the farmer who was putting up silage could more easily reach it than if it was located on the other side. The purpose at that time was to manufacture a machine which would

make it easier for one man to run the entire operation. Also, Sousek said that the lever was placed in that position because it was immediately adjacent to the clutching mechanism which controlled the auger, although there was no mechanical reason which prevented the lever from being placed on the other side. He also explained one of the reasons for the clutch lever was to prevent overloading the fan.

We are of the opinion that there is credible evidence upon which the jury could find that the positioning of the lever was unusual and misleading. There is credible evidence that the location of the clutch lever contradicted the custom and practice of other manufacturers, who designed their machines in accordance with the accepted functional design engineering rule explained by Dr. Wardle. The jury could well have concluded that the placement of this lever could lead a potential user of the machine to believe he was stopping both the auger and the fan when he pulled the lever. In the absence of a warning to the contrary, the jury could well conclude that the machine was unreasonably dangerous and defective in its design by locating the control lever in such a misleading position without an appropriate warning.

It was demonstrated at trial that the crop blower in question bore a warning label which read in pertinent part:

"BE CAREFUL
"· · ·
"4. Keep hands, feet and clothing away from power-driven parts.
"5. Keep off implement unless seat or platform is provided. Keep others off."

The trial court held that this warning was adequate as a matter of law and that plaintiff had violated this rule when he stepped onto the edge of the hopper. The court explained:

". . . In spite of all the arguments made by plaintiff's counsel that the machine was defective because of the 'misleading' placement of the auger clutch and the failure to have a warning sign on the handle of the auger clutch, the above quoted warning was certainly adequate as a matter of law and according to the rule:

" 'A product bearing such warning which would be safe for use if followed, is not in a defective condition nor is it unreasonably dangerous.' "

Plaintiff was an experienced farmer and testified that he had seen such warning labels on combines in the past, but had never seen the label on this machine. The sign was a standard one used in the industry on various farm machinery. The machine was generally too muddy for the warning to be seen, according to the plaintiff.

Dr. Wardle testified that the warning was not appropriate, nor was it practically located. The label was located low on the back of the belt shield toward the tractor side of the crop blower. Plaintiff characterizes its location as "ankle level." Moreover, the trial court also concluded that if the warning was obscured, it was the fault of the machine owner or the farm owner, and not of the manufacturer. In this respect the trial court committed error. Commensurate with the duty to warn is the duty to make reasonable efforts to bring that warning to the attention of the potential users of the product. Thus the manufacturer may have to anticipate that placing the warning as it did created a reasonable likelihood it would become obscured. In any event, the warning mentions nothing about the *danger* involved, to wit, the fan is not shut off by the lever. While it does warn the user to "keep off" the machine and "keep hands, feet . . . away from power-driven parts," a jury could reasonably infer that the warning appears to be applicable to when the machine is *operating*. Thus, the jury could infer the warning was irrelevant if it chose to believe the testimony submitted by the plaintiff because the alleged defect was that the plaintiff had been led to

believe the machine was *not* operating. "Implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger." *Tampa Drug Co. v. Wait* (Fla. 1958), 103 So. 2d 603, 609.

"The duty to warn . . . is a duty to give a warning which is adequate and appropriate under the circumstances." Annot. (1961), *Products Liability—Duty to Warn*, 76 A. L. R. 2d, p. 15, sec. 2. Moreover, it is generally recognized:

"Various general criteria against which a warning is to be measured to determine its adequacy have been stated by the courts. Thus, it has been said that a seller must give the purchaser of a dangerous article a warning that is accurate, strong, and clear, and readily noticeable.

"Any ambiguity in the language of a warning furnished in connection with the sale of a chattel is to be 'construed against the one who chose the words used.'

"The warning must be appropriate; implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger. From this it follows that the likelihood of an accident's taking place and the seriousness of the consequences are always pertinent matters to be considered with respect to the duty to provide a sufficient warning label, and that there is a particular need for a sufficient warning where there is a representation that the product in question is not dangerous." 63 Am. Jur. 2d, *Products Liability*, p. 62, sec. 53.

Plaintiff testified he believed he had shut off the fan by pulling the lever and the jury was entitled to accept his testimony. Plaintiff persuasively argues that the *adequacy* of the warning was for the jury's determination, citing *Hyland Hall & Co. v. Madison Gas & Electric Co.* (1960), 11 Wis. 2d 238, 243, 105 N. W. 2d 305, and under the facts of this case we are of the opinion the trial court erred in holding that, contrary to the verdict

of the jury, the warning was adequate as a matter of law.

*Misuse of machine.*

The trial court also concluded that directed verdict was proper by finding that plaintiff, at the time of his injury, had his feet on the edge of the hopper and was, therefore, using the defendant's crop blower for a purpose not intended by the defendant. The court relied upon the following emphasized portion of Wisconsin Jury Instructions, Civil 3260:

" 'A manufacturer of a product who places on the market a defective product which is unreasonably dangerous to the user and which is expected to and does reach the user without substantial change in the condition in which it is sold, is regarded by law as negligent even though he has exercised all possible care in the preparation and sale of the product, provided the product was being used for the purpose for which it was designed and intended to be used.' (Underscoring added.) Wis J I—Civil 3260."

In *Dippel v. Sciano* (1967), 37 Wis. 2d 443, 460, 155 N. W. 2d 55, wherein this court adopted the rule of strict liability, it was observed:

"The defense of contributory negligence is available to the seller. The plaintiff has the duty to use ordinary care to protect himself from known or readily apparent danger. Defenses among others that suggest themselves are that the product must be reasonably used for the purpose for which it was intended; abuse or alteration of the product may relieve or limit liability, some products just naturally wear out in such a manner as to render them unsafe and as to others, the intended use can be coupled with inherent danger—anyone can cut his finger with a sharp knife or puncture it with a fishhook, and teeth can be damaged by the sugar in the consumption of soft drinks."

In *Spruill v. Boyle-Midway, Incorporated* (4th Cir. 1962), 308 Fed. 2d 79, 83, 84, it was explained:

". . . 'Intended use' is but a convenient adaptation of the basic test of 'reasonable foreseeability' framed to more specifically fit the factual situations out of which arise questions of a manufacturer's liability for negligence. 'Intended use' is not an inflexible formula to be apodictically applied to every case. Normally a seller or manufacturer is entitled to anticipate that the product he deals in will be used only for the purposes for which it is manufactured and sold; thus he is expected to reasonably foresee only injuries arising in the course of such use.

"However, he must also be expected to anticipate the environment which is normal for the use of his product and where, as here, that environment is the home, he must anticipate the reasonably foreseeable risks of the use of his product in such an environment. These are risks which are inherent in the proper use for which his product is manufactured. . . ."

The trial court recognized that in general the crop blower was being used that day for an intended purpose (putting up silage), but it determined as a matter of law that just prior to the injury plaintiff was not reasonably using the crop blower. Under the facts of this case, we consider this was a matter to be considered by the jury in determining plaintiff's contributory negligence. Every manufacturer intends his machinery to be used *safely*. But it is not necessarily a complete defense to liability to show that the machine was being used otherwise. Under certain circumstances, misuse may constitute contributory negligence and thus be a factor in the comparison of negligence.

It has been generally explained as follows:

"—**Foreseeable Use.** Strict liability in tort has the consequence of relieving an injured party of the obligation of proving either breach of a warranty or negligence on the part of a defendant. This does not mean

that the seller or manufacturer is an insurer with respect to the goods, since there are certain defenses which are available to strict liability in tort actions. While some cases, as will be seen later in the discussion on contributory negligence and assumption of the risk, seem to indicate that evidence of fault on the part of the plaintiff is not admissible by way of defense, it is a general proposition that a plaintiff, to recover in strict liability in tort, must establish that the product proved defective, and the injury occurred when it was used in a foreseeable manner. In other words, foreseeable use is a requirement for a case in strict liability in tort, just as it is in negligence or warranty cases. If the plaintiff can be shown to have used the product in a manner other than its intended use, and particularly if that abnormal use related to the occurrence of the injury, liability should not follow unless the abnormal use was itself foreseeable.

"One of the ingredients of the *Greenman* [3] decision was that the plaintiff was said to have proven that he was injured while using the product in a way it was intended to be used. This aspect of the lead case in strict liability in tort has been followed by many decisions. If, therefore, a steering mechanism manufactured for use with a thirty-five to fifty-horse power motor is modified for use with a seventy-five-horse power motor, the manufacturer should not be liable for a defect which shows up under such use. Alteration of a product in a manner not sanctioned by the manufacturer is a standard form of misuse, or phrased differently, is not a foreseeable use for the product, and strict liability in tort should not and does not generally apply." 2 Frumer, *Products Liability, Scope of Strict Liability,* pp. 3–297 to 3–301, sec. 16A (4) (d).

Although the plaintiff testified he thought the machine was off, he still was "misusing" the machine by standing on the edge of the hopper and using it as a perch. Therefore, it becomes necessary for the jury to determine whether the defendant could reasonably foresee such misuse of its product. ". . . [T]he manufacturer is not liable for injuries resulting from abnormal or

---

[3] *Greenman v. Yuba Power Products, Inc.* (1963), 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 Pac. 2d 897.

unintended use of his product, *if* such use was not reasonably foreseeable. The issue is one of foreseeability, and misuse may be foreseeable." (Emphasis in original.) 1 Frumer, *Products Liability, Abnormal Use,* p. 351, sec. 15; and *Spruill v. Boyle-Midway Incorporated, supra.*

The manufacturer saw fit to put a warning sign on the machine to warn of the danger of standing on it, and a warning to stay off the machine unless a seat or platform was provided. If the manufacturer was able to foresee the necessity of warning users to stay off the machine, it must have foreseen that under some circumstances users and others would stand on the implement. Thus, standing on the machine was a "misuse" of it, such as was foreseeable by the defendant and such misuse would not ipso facto bar recovery. Rather, it was an act to be appropriately considered by the jury in determining the contributory negligence of the plaintiff.

In this case, whether the danger was apparent or not was disputed at trial. Both the jury and the trial court observed the machine. The plaintiff testified he did not see the fan running nor did he believe it was still running when he stepped onto the hopper of the crop blower. Therefore, under the facts of this case the question of the misuse of the machine rests upon the credibility of the witnesses and the reasonable inferences that could be drawn from the evidence presented, and is a proper issue for the jury to determine.

We, therefore, conclude that the trial court erred in determining as a matter of law that the plaintiff was not reasonably using the implement for an intended purpose at the time of the injury.

### *Plaintiff's contributory negligence.*

The rule is that a verdict should only be directed against a plaintiff where the plaintiff's evidence, giving it the most reasonable construction it will reasonably

bear, is insufficient to sustain a verdict in the plaintiff's favor. *Hollie v. Gilbertson* (1968), 38 Wis. 2d 245, 249, 156 N. W. 2d 462. Generally, the apportionment of negligence is for the jury and will not be upset except where it is manifest as a matter of law that the allocation is unreasonably disproportionate. Where, however, it appears that the negligence of the plaintiff is as a matter of law equal to or greater than that of the defendant, it is not only within the power of the court but it is the duty of the court to so hold. *Skybrock v. Concrete Construction Co.* (1969), 42 Wis. 2d 480, 490, 167 N. W. 2d 209.

In this case we are of the opinion that the trial court was correct in determining that the negligence of the plaintiff equaled or exceeded that of the defendant.

The only credible evidence to support a verdict for the plaintiff is that he pulled the clutch lever and because of its position on the crop blower believed that it disengaged both the fan and the auger, when in fact it only disengaged the auger. While the plaintiff's testimony that he thought the fan had stopped could be taken as true, it is clear from these facts that he should have known the fan continued to operate.

The plaintiff was a farmer and had lived on a farm practically all his life. He was familiar with farm machinery. He had worked with this same machine two- and one-half days the previous year, and a full day on the day of the incident. He knew that the crop blower was equipped with a fan capable of propelling silage through a nine-inch pipe at least far enough to reach the top of a silo. It was essential that the fan continue to operate after the auger stopped in order to clear the pipes, and no machine was manufactured by any manufacturer, in which the clutch stopped both the fan and the auger.

On at least two previous occasions on the day in question, the conveyor belt had come off the sprocket and on each occasion plaintiff disengaged the clutch lever. He

never did look to see if the fan was disengaged. His counsel argues that even if he had looked, the fan operates so rapidly, that one looking would be unable to tell whether the fan was operating or not. As the trial court observed, ". . . [T]here is no substance to this [argument], for anyone knows that if a fan is stopped one can see the blades . . . , but if it is running or operating one cannot see them."

On the two previous occasions that day when the conveyor belt malfunctioned, he stood on the ground to replace it. On the third occasion, late in the afternoon, he chose to balance or "perch" himself in the dangerous and precarious position with his feet on the narrow rim of the crop blower, while the tractor which powered it was running. In this position, he was approximately 18 inches from the fan, and he testified he felt some vibration. While so situated, he attempted to balance himself only by the use of his feet and used his body and hands to reach over and down and re-engage the conveyor belt. He slipped and fell into the hopper and this unfortunate accident was the result. He testified that he took this position on the rim of the crop blower because the "grandfather" was standing in the position where the plaintiff had stood on the two previous occasions when he fixed the machine while standing on the ground. He did not ask the "grandfather" to move because he was an old man and "you couldn't tell him much." He had been told by Gordon Kohlbeck to have Kiel, the owner of the machine, replace the chain on the sprocket. However, because he had done it twice before on this day, he attempted to do it a third time.

We have considered all of the arguments advanced by the plaintiff on this issue and are of the opinion the order and judgment of the trial court granting the motion of the defendant for a directed verdict should be affirmed.

*By the Court.*—Order and judgment affirmed.