(No. 52608.—

BRUCE ALLEN PALMER, a Minor, Appellee, v. AVCO DISTRIBUTING CORPORATION, Appellant.

*Opinion filed October 17, 1980.—Rehearing denied November 26, 1980.*

UNDERWOOD and RYAN, JJ., dissenting.

Lord, Bissell & Brook, of Chicago (Richard E. Mueller, Richard F. Johnson, and Norman J. Lerum II, of counsel), for appellant.

Joseph A. Rosin, of Chicago, for appellee.

MR. JUSTICE CLARK delivered the opinion of the court:

On April 27, 1973, 11-year-old Bruce Allen Palmer and his brother accompanied Allen Miller and his two sons to the Edward Kalvelage residence to borrow a bulk fertilizer spreader. The boys returned with Miller to his farm and

helped him shovel fertilizer into the borrowed spreader, defendant Avco Distributing Corporation's (hereafter Avco) Model 114. Miller began fertilizing. Some of the boys rode on top of the fertilizer inside the spreader.

The spreader was towed by a tractor operated by Miller. The spreader measured about 6½ feet long, almost 8 feet wide and more than 6 feet high. At the bottom of the spreader was an agitator, a sharp toothed rotary type instrument which ran the length of the spreader and was designed to chew up fertilizer lumps into granules. The sides of the spreader were V-shaped, so that the fertilizer dropped by force of gravity toward the agitator in the bottom. Below the agitator was an augur which fed the granules into a spinner, located in the rear of the spreader. The spinner distributed the fertilizer. Above the agitator were two pieces of metal, 4 inches wide and 85 inches long, joined lengthwise at a 90-degree angle. Called the baffle, it kept the weight of a full load of fertilizer off of the agitator. The agitator rotated only when the spreader was pulled forward. A metal bar designed to hold a canvas top ran above the hopper.

Bruce Palmer, the plaintiff in this action, received injuries necessitating the amputation of his leg well above the knee when his left leg got caught in the agitator. The facts were extensively detailed in the appellate court opinion (75 Ill. App. 3d 598) and will be presented here in more abbreviated form.

Plaintiff initially sued Avco, Miller and Miller Farms, Inc. (hereafter Miller Farms) and Edward Kalvelage. Miller filed a third-party complaint against Avco and International Minerals, Inc. (hereafter International), seeking indemnification if he was found liable to plaintiff. Before trial, however, a platform loan agreement was executed between Country Mutual Insurance Co., representing defendants, Miller, Miller Farms, and Kalvelage, and the plaintiff.

Under the agreement, Country Mutual loaned plaintiff $266,000, to be repaid at the rate of 20% of the amount of the verdict obtained against Avco which exceeded $500,000. Thus a verdict of $1,830,000 against Avco would have resulted in a complete repayment of Country Mutual. Lesser verdicts that exceeded $500,000 would have resulted in partial repayments. In return for the loan, Miller, Miller Farms and Kalvelage were dismissed as defendants. A second agreement, the terms of which were not revealed on the record, resulted in the discharge of International Minerals in return for $7,500. In the suit against the remaining defendant, Avco, a jury in Cook County found that the spreader was unreasonably dangerous and that this condition was a proximate cause of plaintiff's injuries, and it awarded $492,000 in damages. Upon an appropriate motion, the trial judge refused to credit the $273,500 received by the plaintiff pursuant to the agreements toward the verdict of $492,000.

The appellate court affirmed the jury verdict and the trial judge's refusal to credit the money received pursuant to the agreements against the jury verdict. One judge dissented on the latter issue. (75 Ill. App. 3d 598, 609.) We granted leave to appeal. Defendant questions the sufficiency of the evidence supporting the jury determination that the fertilizer spreader was unreasonably dangerous due to defective design and inadequate warnings and instructions. Since we affirm the jury's finding on this issue, we must consider defendant's second contention: whether money paid pursuant to the platform loan agreement by the dismissed defendants should have been credited toward the jury verdict rendered against Avco. On this issue we reverse the appellate court.

The evidence amply supports the jury's determination that plaintiff's injuries resulted from a condition of the fertilizer spreader, that its condition was unreasonably dangerous, and that this condition existed at the time it

left the manufacturer's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623.) If these elements are proved, liability will attach despite the exercise of due care by the seller and regardless of contractual relationships. Restatement (Second) of Torts secs. 402A(2)(a), (b) (1965).

The marriage of tort and contract concepts (see *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 619) has not occasioned complete domestic tranquility in the strict liability household. A product is unreasonably dangerous when it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." (Restatement (Second) of Torts sec. 402A, comment *i* (1965); *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211-12; *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342.) This evidences the warranty heritage of strict liability.

Avco challenges the jury verdict on three grounds. First, it contends that the spreader was used in an unforeseeable fashion. Second, it contends that the design of the product was not unreasonably dangerous. Finally, it contends that, in view of a warning placed on the spreader, it was not being used as intended.

Unquestionably there was evidence from which the jury could infer that farm personnel, household members and children customarily rode in fertilizer spreaders, making this use of the spreader foreseeable. Three farmers and one expert witness testified to their personal knowledge of that custom. Defendant maintains that there was no evidence that children like the plaintiff customarily rode in fertilizer spreaders for purposes other than performing farm chores. Defendant itself, however, cross-examined one of plaintiff's witnesses, a full-time farmer, and elicited testimony contrary to its contention:

"Q. Do you think it is a good practice to allow an 11-year-old boy with no farm experience on a spreader?

A. Well, it is not a good practice, but it is done."

At least one other witness testified that in his experience farmers customarily had people ride on their vehicles and specifically that children sometimes accompanied their parents by riding on fertilizer spreaders and other vehicles for both pleasure and work purposes. Defendant did produce farm witnesses who testified that no such custom existed; but the conflict engendered by this evidence and the credibility of plaintiff's witnesses were questions within the province of the jury to resolve. We conclude, therefore, that the jury could have decided reasonably from the evidence that it was objectively foreseeable that children of plaintiff's age might ride inside fertilizer spreaders. Thus distinguished is *Winnett v. Winnett* (1974), 57 Ill. 2d 7, in which there were no allegations that very young children were customarily allowed to roam unattended close to operating farm machinery.

Defendant contends, however, that the foreseeability of a harmful risk alone is not the sole determinant of a manufacturer's duty. And if by this defendant means that a manufacturer is under no duty to sell products incapable of causing injuries, it is of course correct. (*Kerns v. Engelke* (1979), 76 Ill. 2d 154, 166.) But the jury's decision that this spreader was unreasonably dangerous is supported by the evidence.

Dr. Norval Wardle, a retired agricultural engineer in safety at the University of Iowa, testified that, based on his inspection, Avco model 114 was an unreasonably dangerous fertilizer spreader. His opinion was grounded upon (1) the known propensity of fertilizer to clog, interfering with the flow of fertilizer to the spinner (insofar as the lumps were too large to pass under the baffle to the agitator), (2) the false sense of security engendered in one inside the spreader by the placement and appearance of

the baffle, (3) insufficient guarding of the agitator to prevent one inside the spreader from getting hands or feet caught in the agitator, (4) the lack of instructions on the machine describing the appropriate procedures to eliminate fertilizer lumps formed in the machine, and (5) inadequate warning of the hazard of the agitator. In explaining his opinion, he noted that unless farmers carried a club-like instrument to break up fertilizer clumps, they would have to climb inside the spreader and crush them with their feet. If another person were available to help, it would be natural for that person to remain inside the spreader as they were fertilizing to avoid having to stop the tractor each time lumps interfered with the flow of fertilizer. The placement of the baffle appeared ideally suited for someone inside the spreader to stand on. And the bar across the top of the spreader appeared to offer a perfect handhold for one riding inside it. Yet at the same time the baffle only prevented one from recognizing the hazard posed by the agitator; it did not prevent one from slipping into it.

Dr. Wardle said that the Avco model 114 could have been made safely if grids, grillwork, bars or the equivalent had been installed at some point at the top of or inside the spreader. Admitting that further testing would be necessary to determine the ultimate form and feasibility of such devices, he nevertheless contended that, based on prior experience with similar problems, some such device was workable. These features, in his opinion, could have been added at an approximate cost of $50 per spreader. Dr. John Siemens, an agricultural engineer at the University of Illinois, testified similarly to Dr. Wardle.

Plaintiff's expert witnesses' testimony was controverted by expert witnesses for Avco, who said that the spreader was safe because it was designed for operation by one person. Thus, when lumps had to be broken up, this person would necessarily stop the tractor, automati-

cally terminating the agitator's rotation. The positioning of the agitator at the bottom of the spreader and the warning sign on the machine also were considered adequate safeguards. These experts contended that no bars or grillwork could be placed inside the machine without interfering with the flow of fertilizer. The force of this testimony was diluted by the presence of screens and grills inside conveyor-type spreaders, by the tendency of fertilizer to clog even in an Avco spreader and by their admitted failure to test any of the devices suggested by plaintiff's experts. It also was admitted that they left the problem of clumping fertilizer up to the ingenuity of each farmer.

Certain benefits of the model 114 design were claimed, however. Among them were a more even spread of fertilizer because of the success of the agitator in breaking up all but the largest fertilizer lumps and the avoidance of an uneven weight distribution inside the spreader as the fertilizer was discharged. A conveyor-type spreader, in contrast, unloaded fertilizer from front to back so that when it is half full all the weight is in the rear of the spreader.

These conveyor-type spreaders operate without an agitator. Instead, a link-chain conveyor carries lumps of fertilizer back toward the spinners. Still other spreaders rely on a coil, in place of an agitator, to break up fertilizer lumps.

We think that a jury could conclude reasonably from this evidence that the use of a sharp-toothed agitator without a guard or other safety device was not reasonably necessary to the effective operation of a bulk fertilizer spreader. Thus evidence was introduced to prove the unreasonable danger of the fertilizer spreader in the two ways this is ordinarily proved (see generally *Barker v. Lull Engineering Co.* (1978), 20 Cal. 3d 413, 573 P.2d 443, 143 Cal. Rptr. 225): (1) introducing evidence that

people customarily rode in spreaders to break up fertilizer lumps and for other purposes, that they could do so in other spreaders without risk of harm and that their expectation would be that they could do so in the Avco spreader (Restatement (Second) of Torts sec. 402A, comment *i* (1965); *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 211; *Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 342) and (2) introducing evidence that the Avco spreader could have been designed to prevent a foreseeable harm without hindering its function or increasing its price. See *Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 437-41; *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 161-66; *Anderson v. Hyster Co.* (1979), 74 Ill. 2d 364, 368-69.

Defendant contends, however, that a warning placed in front of the spreader near the operator's controls prevents a finding of liability. The warning is reproduced here in its actual size and design:

**BE CAREFUL**

1. KEEP ALL SHIELDS IN PLACE.
2. STOP MACHINE TO ADJUST AND OIL.
3. WHEN MECHANISM BECOMES CLOGGED, DISENGAGE POWER BEFORE CLEANING.
4. KEEP HANDS, FEET AND CLOTHING AWAY FROM POWER-DRIVEN PARTS.
5. KEEP OFF IMPLEMENT UNLESS SEAT OR PLATFORM IS PROVIDED.
   KEEP OTHERS OFF.

Just last term we noted that a failure to warn could result in an action for strict liability despite the otherwise non-actionable nature of the product. (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 30.) We did not in that case, however, discuss the circumstances under which a given warning could be deemed inadequate. In strict liability cases, warnings function either to shift the risk or reduce it. Unavoidably unsafe products may require a warning to inform the consumer that harm sometimes results from the product. (See, *e.g., Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 550-51.) If the warning is adequate, consumers proceed to use the product at their own risk. The warning here, however, was supposed to function to reduce the probability that harm would occur at all from a design otherwise unreasonably dangerous.

The adequacy of warnings of either type usually present jury questions (*Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 553; *cf. Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 343-44). Other jurisdictions have recognized that warnings could be inadequate, for example, if they did not specify the risk presented by the product (*Jackson v. Coast Paint & Lacquer Co.* (9th Cir. 1974), 499 F.2d 809, 811-14; *Kozlowski v. John E. Smith's Sons Co.* (1979), 87 Wis. 2d 882, 899, 275 N.W.2d 915, 922-23; *Schuh v. Fox River Tractor Co.* (1974), 63 Wis. 2d 728, 218 N.W.2d 279 (a case similar to the instant one)), if they were inconsistent with how the product would be used (*Anderson v. Klix Chemical Co.* (1970), 256 Or. 199, 207-10, 472 P.2d 806, 810-11), if they did not provide the reason for the warning (*D'Arienzo v. Clairol, Inc.* (1973), 125 N.J. Super. 224, 310 A.2d 106 (linguistic sufficiency and product environment were relevant factors)), or if they did not reach foreseeable users (*Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.* (9th Cir. 1977), 565 F.2d 1129, 1136; *Jonescue v. Jewel Home Shopping Service* (1974),

16 Ill. App. 3d 339). The variety of products and warnings has produced a spate of litigation on this subject. (See Annot., 53 A.L.R.3d 239 (1973).) And this is an area of the law in which the principle—that the warning must be adequate to perform its intended function of risk reduction—is clear even while its application is not necessarily uniform.

Considering this principle, there was sufficient evidence from which the jury could infer that the warning was ineffective. The warning itself did not specify the danger presented by the agitator. It did not detail the extent of the risk it posed to life and limb. Plaintiff's expert said the warning was inadequate because:

> "It is very general and does not go to the specific hazard of this particular machine. The hazard that we are concerned with here is the agitator. There is no mention in here about the agitator, no clarification as to its location or why it is a hazard or anything like that."

In addition to the inadequacy of the warning itself, the jury could have determined reasonably that the design of the spreader was inconsistent with it. The sign was rather small compared to the size of the spreader, and its placement could reasonably have been deemed insufficient to warn foreseeable users like this plaintiff or operators like Miller. Plaintiff's expert noted that the baffle appeared to be suitable to support someone riding inside the spreader and therefore gave "a false sense of security," whereas it was "actually open and not sufficiently guarded to prevent an individual having their foot or hand go in if for any reason they are in the box of this fertilizer spreader."

The jury was able to determine whether these opinions were justified. It examined the spreader itself, a new warning plate like the one on the spreader, and a picture of the actual warning plate on the spreader. This first-hand inspection helps convince us that the jury's deter-

mination of the ineffectiveness of the warning was reasonable, so we join the jury, the trial judge and the three appellate court judges in concluding that this fertilizer spreader was unreasonably dangerous despite the warning. The defects in this warning apply equally when considering the spreader's use by Miller and by the plaintiff, and, therefore, defendant's cryptic statement that the sole proximate cause of the injury, as a matter of law, was Miller's misuse of the product cannot be taken seriously.

In sum, then, we hold that despite the warnings the Avco model 114 fertilizer spreader was unreasonably dangerous in view of user expectations and possible alternative designs. It is enough, of course, that these conditions resulted in plaintiff's injury. *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 623.

Because we affirm the jury verdict, we must consider the effect of the platform loan agreement. This issue is largely foreclosed by *Popovich v. Ram Pipe & Supply Co.* (1980), 82 Ill. 2d 203, decided this same day. It would serve no useful purpose to develop again the *Popovich* rationale, which was based on the long-standing policy against double recoveries. In this case, however, it is necessary to dispose of additional reasons proffered by the appellate court in reaching a contrary result.

In considering the appellate court's rationale, it is helpful to set forth the pertinent portions of the instant agreement:

> "Repayment shall be made only in the event that a judgment is rendered against Avco Distributing Corporation, in favor of the Plaintiff, Bruce Allen Palmer, in excess of Five Hundred Thousand ($500,000) Dollars and collection actually made thereon, and then only to the limited extent of Twenty (20%) Percent that the actual net recovery and collection exceeds said sum of Five Hundred Thousand ($500,000) Dollars."

The appellate court decided that this agreement should be enforced as written because (1) the entire loss was not

shifted to one party as is the case with typical loan agreements, (2) a normal loan agreement like that approved in *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, would have left Avco in the same financial position it now occupies without grounds for complaint, (3) it came within the rule of *Henson Robinson Co. v. Industrial Com.* (1944), 386 Ill. 232, in which a party to an agreement waived its right to indemnification, and (4) Avco should not be able to claim the agreement was a covenant not to sue for purposes of setoff while treating it as a loan for purposes of cross-examining the settling party.

This reasoning is unpersuasive. The loss, as determined by the jury, would be borne by one party (Avco) if the agreement were enforced as written, although Country Mutual would still make payment to the plaintiff unless the jury verdict were as high as $1,830,000. Further, unlike the agreement in *Reese,* the settling parties used one damage figure for purposes of their settlement while acknowledging a higher damage amount to be fulfilled by one not a party to the agreement. Such an agreement divorces the risks of the bargaining process from the establishment of a damage figure to the detriment of nonsettling parties. This State has a policy of protecting the financial interest of nonsettling parties in a settlement (*cf.* Ill. Rev. Stat. 1979, ch. 70, pars. 302(c), (d) (settlements must be executed in good faith before they will relieve the settling party from liability for contribution); see Michael, *"Mary Carter" Agreements in Illinois,* 64 Ill. B.J. 514, 527-28 (1976); *Stambaugh v. Superior Court* (1976), 62 Cal. App. 3d 231, 235-39, 132 Cal. Rptr. 843, 845-48; N. Appel & R. Michael, *Contribution Among Joint Tortfeasors in Illinois: An Opportunity for Legislative and Judicial Cooperation,* 10 Loy. Chi. L.J. 169, 198 (1979)), and this is an appropriate case to implement that policy.

The appellate court, however, relying on *Henson Robinson Co. v. Industrial Com.* (1944), 386 Ill. 232, argued that Country Mutual could waive its right to be indemnified from the verdict for its loan. In *Henson Robinson,* a third-party tortfeasor settled with plaintiff for $1,500 and this court allowed this sum to be added to an award subsequently obtained under the Workmen's Compensation Act. In claiming a right to a setoff, however, the employer's insurer acted inconsistently with its earlier agreement to the settlement. This settlement included all parties. The evidence showed that the intent of all parties was to provide the employee with more damages than were comprehended by the Workmen's Compensation Act. The insurer also received a settlement from the third-party tortfeasor as a part of that same agreement. In the instant case, Avco was not a party to the agreement and it did not waive any right to a setoff. In addition, statutory limitations on damages present issues distinguishable from the case at bar when an injury has been concurrently caused by persons within and without the statutory coverage. Our appellate court has grappled with such issues for some time. See, *e.g., Slone v. Morton* (1963), 39 Ill. App. 2d 495; *Kurth v. Amee, Inc.* (1972), 3 Ill. App. 3d 506.

Although we consider *Henson Robinson* inapplicable to this case, in which the enforcement of the agreement as written would result in payment of damages equal to the sum of the consideration paid per the settlement and the verdict returned by the jury, we are also aware of those cases in which amounts of money received pursuant to settlements exceeded jury verdicts subsequently entered against joint tortfeasors. (See, *e.g., De Lude v. Rimek* (1953), 351 Ill. App. 466, 474-75; *Price v. Wabash R.R. Co.* (1961), 30 Ill. App. 2d 115, 117-18.) A loan agreement for an amount exceeding a jury verdict would present a question different from the one we decide today.

Finally, we note that Avco has not waived any right to a setoff by cross-examining a witness who may have been biased as a result of the settlement agreement. It is not necessary for us to determine that an agreement is a covenant not to sue before forbidding a double recovery. (See Restatement (Second) of Torts sec. 885, comment *e* (1979).) Therefore, Avco has not acted inconsistently.

In this connection, we also note that the terms of the agreement itself were properly admitted into evidence. In *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 364, we stated that adequate protection for defendants exists "if by cross-examination they are permitted to establish that a witness knows of the existence of a loan agreement, and, if so, that the witness may be biased or prejudiced as a result thereof. In the event that the existence of such agreement is established, an appropriate instruction limiting the effect of the admission into evidence of the loan-receipt terms might be given at the request of any party." Thus *Reese* contemplated the admission of the terms of the agreement itself, which seems logical since such terms would be very relevant in determining the lack of or extent of witness bias. Full revelation also seems preferable to permitting jury speculation about an agreement's precise terms. Of course, *Reese* cannot be considered to have abrogated the evidentiary principles of relevance (*e.g., Casson v. Nash* (1978), 74 Ill. 2d 164, 169-70) or hearsay (see, *e.g., State of Indiana v. Ingram* (1980), —— Ind. App. ——, ——, 399 N.E.2d 808, 811), and these principles were not contravened in the instant case. Obviously the procedures followed here were not prejudicial to the defendant. It was properly allowed to cross-examine the witnesses who were potentially biased as a result of the loan agreement.

It is just as obvious, however, that in some cases there exists the possibility that a plaintiff will be prejudiced by

the revelation of the loan-receipt agreement (see 1 J. Dooley, Modern Tort Law sec. 26.16 (1977); see also *Palmer v. Avco Distributing Corp.* (1979), 75 Ill. App. 3d 598, 609 (Rizzi, J., concurring in part and dissenting in part)). Plaintiff argues that, because the jury was aware of the agreement's terms, it intended to award damages in the amount of the $492,000 verdict plus the $266,000 which, pursuant to the agreement, was to be retained by the plaintiff. Since we now hold that the $266,000 will be set off against the verdict, plaintiff argues that a new trial on damages, with a properly instructed jury, is necessary. We agree. In view of our decision today, an instruction informing the jury that amounts retained pursuant to revealed settlements will be credited toward its verdict is unobjectionable under *Reese.* (See also *American State Bank v. County of Woodford* (1977), 55 Ill. App. 3d 123, 134-35.) The jury here was instructed to consider the loan agreement only as bearing upon witness credibility, and while this instruction was proper (*Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 364), it was insufficient to avoid the problem perceived by plaintiff and insufficient to instruct the jury according to the principles we announce today in *Popovich* and herein. As was stated by one justice in the appellate court:

> "[T]he jury was not fully informed of the effect of the agreement regarding the $266,000. Since the jury was advised that the plaintiff received $266,000 and it would have to be repaid only if he received a verdict in excess of $500,000, the jury should also have been informed that any amount of the $266,000 that the plaintiff did not have to pay back to Country Mutual would be deducted from the amount of any verdict against Avco.
>
> Under the circumstances that occurred in the

trial, the jury was left with the improper impression that if it returned a verdict for $492,000, the plaintiff would keep the $266,000 and receive an additional $492,000. This was error requiring a new trial since we should not speculate as to what the jury would have awarded the plaintiff if it was fully informed as to the effect of the agreement with regard to the $266,000. In this regard, it is worth noting that the jury, having heard repayment would be made under the agreement only in the event the verdict exceeded $500,000, returned a verdict for the plaintiff just under that repayment level." (*Palmer v. Avco Distributing Corp.* (1979), 75 Ill. App. 3d 598, 613 (Rizzi, J., concurring in part and dissenting in part).)

We therefore hold that a new trial on damages is required.

For the reasons stated, we affirm the judgment of the appellate court on the liability issue but reverse its decision on the effect of the loan agreement. The judgment of the circuit court is affirmed as to liability and vacated as to the amount of damages. The cause is remanded to the circuit court for a new trial on the issue of damages according to the views set forth herein.

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part and vacated in part; cause remanded.*

MR. JUSTICE UNDERWOOD, dissenting:

While the court purports to distinguish our earlier decision in *Winnett v. Winnett* (1974), 57 Ill. 2d 7, the two opinions seem to me philosophically irreconcilable. I join Mr. Justice Ryan's dissent on the issue of liability.

MR. JUSTICE RYAN, also dissenting:

This is another products liability case involving farm

equipment designed for the application of fertilizer in which I cannot agree with the opinion of my colleagues. (See *Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206, 218 (Ryan, J., dissenting).) My dissent here, as in *Thomas*, is based upon the failure to abide by, and a complete disobedience of, a clear warning plainly printed on the vehicle. There is no contention here, as there was in *Schuh v. Fox River Tractor Co.* (1974), 63 Wis. 2d 728, 218 N.W.2d 279, where a similar warning was involved, that the label had not been seen or that it was located in such a position that it was not visible.

I also want to initially note that the opinion of Dr. Norval Wardle that this spreader was unreasonably dangerous is based on the dangers to one who is in the hopper of the spreader to break up lumps of fertilizer. The record does not establish that the plaintiff was in the spreader for that purpose, or that it was intended that this machine be used in that manner. It is interesting to note that Dr. Wardle also testified for the plaintiff in the Wisconsin case above cited.

The opinion seems to focus on evidence which would constitute this piece of machinery unreasonably dangerous because of the way it was constructed, and because Dr. Wardle testified that the spreader could have been made with some type of protective grids or grillwork at a cost of approximately $50. This evidence, as I see it, is relevant only insofar as it indicates a foreseeable danger from other than the normal use of the spreader. Likewise, the testimony that people, including children, customarily rode in the fertilizer spreader is relevant only insofar as it relates to the individuals to whom injury may be reasonably foreseen and a use of the spreader that may be reasonably foreseen. This machine was not dangerous if used in the manner and for the purpose for which it was designed. It was designed for a one-man operation. It was not powered by a power takeoff, but was designed so that when it was

not moving, the rotating agitator in the bottom of the hopper, which Dr. Wardle viewed as dangerous, was not in operation. If the person operating the machine had to stop to break up lumps of fertilizer in the hopper, he was in no danger, because the agitator would not be in motion. Thus, the testimony of the experts to the effect that this machine was unreasonably dangerous relates only to its condition if not used in the manner intended.

However, it was reasonably foreseeable that it would not be used as intended and that an injury might result from such an intended use. This then brings this case within the purview of Restatement (Second) of Torts section 402A, comment *h*, at 351-52 (1965), which states that a product, not defective when safe for normal use, may be defective in the absence of a warning if the manufacturer has reason to anticipate that injury may result from the particular use which is reasonably foreseeable. A product sold under these conditions without an adequate warning of the danger is in a defective condition. Likewise, although not relevant here, if there is a known or foreseeable danger when the product is used in its normal or intended use, there is a duty to adequately warn. See Annot., 53 A.L.R.3d 239, 249, 251, 255 (1973); *Jonescue v. Jewel Home Shopping Service* (1974), 16 Ill. App. 3d 339, 344; *Genaust v. Illinois Power Co.* (1974), 23 Ill. App. 3d 1023, 1031, *aff'd* (1976), 62 Ill. 2d 456; *Greiner v. Volkswagenwerk Aktiengeselleschaft* (3d Cir. 1976), 540 F.2d 85.

The law does not require that a product be accident proof, incapable of causing harm, or accompanied by a warning against every injury that may be incurred in the use of the product. The purpose of a warning is to apprise a party of a danger and to enable him to protect himself against it. (*Jonescue v. Jewel Home Shopping Service* (1974), 16 Ill. App. 3d 339, 345.) In our case, assuming, as we must, that a warning was required, the controlling

question concerns the adequacy of the warning, that is, was it sufficient to apprise the parties of a danger and to enable them to protect themselves against it. If a warning is adequate, then, as noted in Restatement (Second) of Torts section 402A, comment *j*, at 353 (1965), the product is not in a defective condition, nor is it unreasonably dangerous:

> "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."

It is hard to believe that any farmer experienced in the use of fertilizer spreaders, as Miller was, would not be well aware of the dangers inherent in putting or permitting an 11-year-old child to be in the hopper of a fertilizer spreader, the sides of which sloped inward, with a rotating agitator and auger in the bottom of the V-shaped bin. But even indulging in this absurd assumption, the warning plainly warned of the danger present. It is not contended that either Miller or the plaintiff did not see the warning on the vehicle or understand the dangers against which it was designed to protect. It is not necessary, as the majority opinion seems to hold, that the precise nature of the dangers be specified. There are any number of different types of injuries that could happen if a person were to ride in the fertilizer spreader. The hopper was 74 inches high. A child riding on a full load of fertilizer could possibly be drawn down into the fertilizer as it was being augered out, and suffocate, an arm or leg could become caught in the moving machinery in the hopper, or one could suffer serious injury by falling on the slippery, sloping sides of the hopper. Certainly, a laundry list of dangers that may be encountered riding in or on the hopper need not be posted. Such a warning would be so detailed as to be meaningless.

The warning required must be sufficient to place a user on guard against the harmful consequences that might result from the use of the product. (*Tampa Drug Co. v. Wait* (Fla. 1958), 103 So. 2d 603.) Implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise, for his own safety, caution commensurate with the potential danger. (See Annot., 76 A.L.R.2d 9, 37 (1961).) I would hold as a matter of law that the warning "Keep off implement unless seat or platform is provided. Keep others off," which was attached to the fertilizer spreader, plainly meets these standards of adequacy. If these warnings would have been heeded by Miller or the plaintiff, the injury could not have happened. In my dissent in *Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206, 219, I referred to the New York case of *Walk v. J.I. Case Co.* (1971), 36 App. Div. 2d 60, 318 N.Y.S.2d 598, in which recovery was barred as a matter of law where the operator of a corn-picking machine was injured while removing husks from the snapping rollers, contrary to instructions printed on a warning plate on the machine cautioning against cleaning the machine while in operation. One cannot violate simple, clear and plainly worded warnings and then recover from the manufacturer for injuries sustained from what must be considered to be an intentional or knowing violation of a warning which, if heeded, would have prevented the injury. (See Restatement (Second) of Torts sec. 402A, comment *n*, at 356 (1965).) This is not a contributory negligence rationale. Under the authorities cited above, if the warning is adequate, the machine "is not in defective condition, nor is it unreasonably dangerous." (Restatement (Second) of Torts sec. 402A, comment *j*, at 353 (1965).) Also, the violation of a plain and adequate warning which, if heeded, would have prevented the injury constitutes an assumption of the risk. Restatement (Second) of

of Torts sec. 402A, comment *n,* at 356 (1965); *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418.

The majority opinion cites the Wisconsin case of *Schuh v. Fox River Tractor Co.* (1974), 63 Wis. 2d 728, 218 N.W.2d 279, which I have referred to above. In that case the warning given was identical to that part of the warning in our case which I have quoted. However, in the Wisconsin case the location of the warning was such that it was not easily visible and plaintiff testified he had not seen the warning on the machine. Also, in that case there was a lever on the crop blower which the plaintiff thought controlled both the auger in the blower and the blower fan. In fact, the lever only controlled the auger, and the fan remained in operation even though the lever was moved to neutral. In order to make some repairs, plaintiff threw the lever and stood on the edge of the hopper of the crop blower. When he did so, he slipped and was injured by the blower fan, which was still in operation. The court, noting that plaintiff had testified he believed he had shut off the fan when he pulled the lever, held that under the facts of that case the adequacy of the warning was a question of fact for the jury. We have no contention of any misunderstanding or ambiguity, or that the warning had not been seen in our case. I would hold, as a matter of law, that the warning was adequate to inform Miller and the plaintiff of the danger so that they could protect themselves against it, and that the plaintiff is barred from recovery as a matter of law.

I also disagree with the handling of the loan agreement by the majority opinion. I will not needlessly lengthen this dissent by detailing my disagreement. Basically, I find offensive the use of a loan agreement in such a manner as to limit Miller's liability in this case. He was grossly negligent. I can find no reason within the realm of sanity that would justify an experienced farmer placing an 11-year-old child in such a dangerous position in violation of a clear

warning not to do so. I view this case as a fulfillment of the prophesy of Mr. Justice Schaefer in the dissent in *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, in which it was stated that the use of the loan agreement tends to throw the entire loss upon the less blameworthy party because the more blameworthy party will be willing to offer more in the pretrial auction for the opportunity to enter into a loan agreement and thus hopefully to escape liability altogether. *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 365 (Schaefer, J., dissenting).

For the reasons stated above, I would hold that the plaintiff is not entitled to recover.