# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2020AP1124

†Petition for Review filed.

Complete Title of Case:

**MATTHEW W. MURPHY,**

**PLAINTIFF-APPELLANT,**

**WISCONSIN POWER AND LIGHT COMPANY,**

**INVOLUNTARY-PLAINTIFF,**

**V.**

**COLUMBUS MCKINNON CORPORATION,**

**DEFENDANT-RESPONDENT. †**

| | |
|---|---|
| Opinion Filed: | July 8, 2021 |
| Submitted on Briefs: | December 10, 2020 |

| | |
|---|---|
| JUDGES: | Blanchard, Kloppenburg, and Nashold, JJ. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Douglas J. Phebus* and *Victor M. Arellano* of *Arellano & Phebus, S.C.*, Madison. |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *Shannon M. Trevithick* and *Debora F. Pagel* of *Britton & Associates SC*, Mequon, and *Kevin J. English* and *Erin E. Connare* of *Phillips Lytle LLP*, Buffalo, New York. |

COURT OF APPEALS
DECISION
DATED AND FILED

July 8, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| Appeal No. | **2020AP1124** | Cir. Ct. No. 2016CV251 |
|---|---|---|
| **STATE OF WISCONSIN** | | **IN COURT OF APPEALS** |

MATTHEW W. MURPHY,

   PLAINTIFF-APPELLANT,

WISCONSIN POWER AND LIGHT COMPANY,

   INVOLUNTARY-PLAINTIFF,

 V.

COLUMBUS MCKINNON CORPORATION,

   DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for Sauk County: MICHAEL P. SCRENOCK, Judge. *Affirmed in part; reversed in part and cause remanded for further proceedings*.

Before Blanchard, Kloppenburg, and Nashold, JJ.

¶1 BLANCHARD, J. Utility line technician Matthew Murphy was injured while trying to load a wooden pole from the ground onto the bed of a trailer. Murphy lifted the pole using a set of metal tongs attached to the end of the winch line of a truck-mounted boom that he operated by remote control, but the pole fell and struck him. The tongs were manufactured by Columbus McKinnon Corporation (CMC). In this products liability lawsuit, Murphy makes a claim of strict product liability for a design defect based on WIS. STAT. § 895.047(1) (2019-20) and also a claim of common law negligent design.[1] Murphy's theory on both claims is that CMC used a defective design in manufacturing the tongs. The circuit court granted summary judgment in favor of CMC on both claims and Murphy appeals.

¶2 Based on the summary judgment materials, we conclude that there are genuine issues of material fact to be resolved by a jury on both claims. Regarding the strict liability claim, we conclude that CMC fails to show that there is insufficient evidence to reasonably support the following possible findings: that CMC's design of the tongs was defective because the foreseeable risks of harm they posed could have been reduced by CMC's adoption of a reasonable, alternative tongs design; that CMC's omission of the alternative tong design rendered its tong design not reasonably safe; that the defective tong design

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted. Separately, we speak in terms of "strict liability" in referring to this claim because that phrase appears in WIS. STAT. § 895.047(1) and also to distinguish between Murphy's claim under § 895.047(1) and his related but separate negligent product design claim. But consistent with discussion in this opinion, *see infra* ¶33, a comment to Restatement (Third) of Torts § 2 suggests that doctrinal terms such as negligence, strict liability, and breach of warranty can be misleading in the context of design defect claims. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt n (AM. L. INST. 1998). All references to the "Restatement (Third) of Torts" or "Restatement (Third)" are to the restatement addressing products liability.

rendered them unreasonably dangerous to persons or property; and that the defective design was a substantial factor in causing Murphy's injuries. *See* WIS. STAT. § 895.047(1)(a), (b), (e). Regarding the negligent design claim, we conclude that CMC fails to show that the evidence submitted on summary judgment is insufficient to reasonably support a finding that CMC's alleged negligence exceeded Murphy's alleged negligence.

¶3 However, we affirm the circuit court's ruling that Murphy has failed to identify evidence sufficient to sustain either claim based on a second alternative design for lifting wooden utility poles that Murphy initially offered.

¶4 Accordingly, we reverse the circuit court's summary judgment decisions, but affirm its ruling that there is no genuine issue of material fact regarding the second alternative design.

## BACKGROUND

¶5 On the day of the accident Murphy was employed by a utility company. He was accompanied by a coworker, but at the time of the accident Murphy alone attempted to lift a wooden utility pole from the ground onto a trailer. To power such a lift, line technicians use a winch line attached to a truck-mounted boom. The boom is controlled by a remote wireless device. This task ordinarily requires the technician to lift the pole roughly parallel to the ground to a minimum height of approximately six feet.

¶6    At issue is a set of metal tongs used for lifting or dragging wooden poles with a so-called Dixie design.[2]  CMC is the parent of the company that designed and manufactured the particular Dixie tongs at issue here in or around 2000, when the utility bought them new.  Dixie tongs in some ways resemble old-fashioned tongs used to carry ice blocks.  They have one tooth on each side.  The two teeth are supposed to attach to a wooden pole by digging into opposite sides for lifting or dragging purposes.  More specifically, when a ring above the hinge on the tongs is pulled upwards by the winch line, the single tooth on each side is supposed to become securely embedded in the pole as the two sides move toward each other, akin to the closing of the opposing blades of a pair of scissors.

¶7    While the parties dispute some specifics, this much is undisputed about how Murphy proceeded with the task.  He either fastened the Dixie tongs to a grappler hook at the end of the winch line or his co-worker had already done that.  Murphy placed the teeth of the tongs on opposite sides of the circumference of the pole while it lay on the ground.  Using the remote control device to operate the boom, he exerted vertical force on the ring holding the tongs and managed to lift the pole into the air by the tongs.  But, at some point the suspended pole fell from the tongs and struck Murphy on the front of his head and a shoulder, and came to rest on top of him.  He was seriously injured.

---

[2] "Dixie" is a trade name under which this design of tongs has been sold, and we follow the parties in using Dixie in referring to the CMC-designed tongs.  The parties sometimes refer to the alternative design that is primarily at issue here, jaw-style tongs, as "Hogg & Davis" (or "H&D") tongs, after the company that manufactures this design of pole-lifting or pole-dragging tongs, but we use the descriptive phrase and not the company name.

¶8      Murphy filed this action against CMC in its product design role as the manufacturer of the Dixie tongs. One claim is for strict product liability based on an alleged design defect under WIS. STAT. § 895.047 and the other is a negligence claim that is similarly based on a theory of design defect. CMC denies the material allegations and has asserted defenses that include contributory negligence and misuse of the tongs by Murphy.

¶9      CMC moved for summary judgment. Regarding the strict liability claim, CMC primarily argued that Murphy could not prove, as he must under WIS. STAT. § 895.047, either that Murphy had identified a safer, reasonable, alternative design or that the Dixie tongs were unreasonably dangerous. Murphy primarily argued in response that an alleged unreasonable risk of failure created by the Dixie tongs could have been reduced or avoided if CMC had used a different, jaw-style design of pole-lifting tongs. At least initially, he also made a parallel argument based on the purported alternative design of a chain, cable, or strap used as a sling or choker-style lifting device.

¶10      Regarding the negligent design claim, CMC argued that there was no dispute of fact that Murphy "disregarded his extensive training and experience by failing to properly position and attach the [t]ongs [to the pole], and by then positioning himself directly underneath the suspended load" before the accident, and that as a matter of law this rendered Murphy's alleged negligence a greater contributor to the accident than CMC's alleged negligence. Murphy contended that evidence that includes proof of an alleged safer alternative design could allow a reasonable jury to determine that Murphy's alleged negligence was not greater than CMC's alleged negligence in causing Murphy's injuries.

6

¶11     While CMC's summary judgment motion was pending, CMC filed a motion in limine to exclude opinions of Murphy's liability expert, John DeRosia. CMC argued that DeRosia's opinions were inadmissible under WIS. STAT. § 907.02 because the opinions were "contradictory," speculative, and "not reliable."

¶12     The circuit court initially denied the summary judgment motion on both claims.  However, at a hearing scheduled to address motions in limine filed by the parties, the circuit court did not rule on any of the motions in limine but instead explained that it had reconsidered CMC's summary judgment motion and decided to grant it on both claims and dismiss the complaint in its entirety. Murphy appeals.

## DISCUSSION

¶13     We review de novo an order granting a motion for summary judgment, applying the same methodology that circuit courts apply.  *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987).  If a claim for relief has been stated based on the pleadings when we take as true all facts pleaded by the plaintiff the remaining issue is whether any factual issues exist under the correct legal standards.  *Id.* at 315-17.  Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  WIS. STAT. § 802.08(2).  A factual dispute is genuine if "a reasonable jury could return a verdict in favor of the nonmoving party" and the dispute is material if it could affect the outcome of the trial under the applicable legal standards.  *See Schmidt v. Northern States Power Co.*, 2007

7

WI 136, ¶24, 305 Wis. 2d 538, 742 N.W.2d 294. "[I]f more than one reasonable inference can be drawn from the undisputed facts, summary judgment is not appropriate." *Id.*, ¶47.

## I.     BOTH CLAIMS:  CHOKER-STYLE DESIGN

¶14     The circuit court granted summary judgment on both claims based in part on its determinations that Murphy failed to identify evidence that CMC's failure to adopt a log-lifting device with a choker-style design could satisfy either the standards established in WIS. STAT. § 895.047(1) or constitute negligent conduct.  We affirm the grant of summary judgment in favor of CMC regarding this specific theory of strict liability or negligence because Murphy concedes through silence that he has forfeited and abandoned argument based on this purported alternative design.

¶15     In neither of Murphy's briefs on appeal does he even attempt to develop a supported argument that he can identify evidence that CMC's failure to adopt a choker-style device could satisfy the WIS. STAT. § 895.047 standards or constitute negligent conduct by CMC.  Both CMC and this court would have to guess at whatever arguments Murphy might make regarding such critical topics as purported safety advantages of this design compared with the Dixie tongs design.

¶16     In contrast, CMC affirmatively renews an argument that it made to the circuit court, supported by evidence, that choker-style devices would not "reduce or avoid any risk associated with loading poles" when the Dixie tongs are used, but instead would increase foreseeable risks.  On this score, CMC notes that Murphy's expert DeRosia conceded that the use of choker-style devices would, as CMC characterizes it, add "its own set of risks, including potential injury resulting from a rolling pole or a pinch point created while [a worker attempted to] lift[]

poles to pass the [choker-style] device underneath [the pole]." As a result, CMC has consistently contended, the choker-style devices "are neither 'true alternatives' to nor 'safer' than" the Dixie tongs design.

¶17    Further, CMC argues that in the circuit court Murphy did not "mention—let alone attempt to refute—[CMC's] undisputed evidence" negating potential safety advantages of a choker-style design. This amounts to a contention that, even beyond failing to present a developed argument supporting this design alternative, Murphy forfeited the issue in this appeal by failing to preserve it in the circuit court. *See Umansky v. ABC Ins. Co.*, 2008 WI App 101, ¶61, 313 Wis. 2d 445, 756 N.W.2d 601 ("Although our review of summary judgment is de novo, we may nonetheless apply [forfeiture] when a party presents an argument for the first time on appeal," and forfeiture "is appropriate where, had the argument been raised in the circuit court, it might have prompted rebuttal with factual information.").

¶18    In his reply brief on appeal, Murphy completely fails to address CMC's arguments about a choker-style device or his failure to address the topic. We treat this as a concession. *See United Co-op. v. Frontier FS Co-op.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (appellant's failure to respond in reply brief to an argument made in respondent's brief may be taken as a concession).

## II.    STRICT PRODUCT LIABILITY CLAIM BASED ON JAW-STYLE TONGS DESIGN ALTERNATIVE

¶19    The parties dispute whether, based on the summary judgment record, there is a genuine issue of material fact regarding Murphy's strict product liability claim under WIS. STAT. § 895.047, based in part on the jaw-style tongs design

alternative. We conclude that CMC has made a prima facie case for summary judgment, but that Murphy has shown that there is evidence that could be credited by a reasonable jury to support a finding of strict liability for a design defect under § 895.047. We first provide an overview regarding the law that applies to a claim of strict product liability for a design defect based on § 895.047(1) and then explain our application of the law to relevant evidence offered by the parties on summary judgment.

### A. Strict Product Liability Design Defect Claims Under WIS. STAT. § 895.047

¶20 Murphy brings a design defect claim against a product manufacturer. This is distinct from a claim of either a manufacturing defect or an inadequate warning.[3] *See* WIS. STAT. § 895.047(1)(a) (classifying strict product liability claims into these three categories); *see also* RESTATEMENT (THIRD) OF TORTS § 2 cmt. d (AM. L. INST. 1998) (when a plaintiff alleges that a product meets the manufacturer's design specifications but has a design defect, this is an allegation that "the specifications themselves create unreasonable risks," unlike a manufacturing defect, which alleges that a product fails to meet the manufacturer's design specifications).[4]

---

[3] Murphy initially alleged, but eventually abandoned in the circuit court, a separate theory of strict product liability based on an allegation of inadequate warning that the Dixie tongs were defectively designed.

[4] We treat comments to the Restatement sections at issue to be a persuasive source of authority in interpreting WIS. STAT. § 895.047. As discussed in the text below, the legislature decided to exactly duplicate language from these Restatement sections, and our supreme court has a long history of citing to Restatement comments in the strict product liability context. *See Dippel v. Sciano*, 37 Wis. 2d 443, 459, 155 N.W.2d 55 (1967) (observing that Restatement (Second) § 402A "is supplemented by several comments that can be helpful in construing the rule when applying it to an individual factual situation"); *Green v. Smith & Nephew AHP, Inc.*, 2001
(continued)

10

¶21     The legislature created WIS. STAT. § 895.047 as part of 2011 Wisconsin Act 2 to establish what a plaintiff must show to prove a claim of strict product liability for a design defect. *See* 2011 Wis. Act 2, §§ 29, 31. As we will explain, § 895.047 to a degree replaces and to a degree supplements common law standards on this topic that were adopted by our supreme court before passage of Act 2. The parties have not identified, and our own research has not revealed, a prior Wisconsin appellate court interpretation of § 895.047.

¶22     It is not clear whether the parties disagree about any interpretation of WIS. STAT. § 895.047. Regardless, we need to understand what plaintiffs must prove in order to properly apply § 895.047 on our de novo review of the challenged summary judgment decisions. This includes, as we shortly explain, the consequences of our legislature's decision to subject claims of product design defects to a "risk-utility balancing test," significantly supplementing the "consumer-contemplation test" formerly adhered to under the common law in Wisconsin. Statutory interpretation itself "presents a question of law that we review de novo." *DOR v. River City Refuse Removal, Inc.*, 2007 WI 27, ¶26, 299 Wis. 2d 561, 729 N.W.2d 396.

---

WI 109, ¶133, 245 Wis. 2d 772, 629 N.W.2d 727 (Sykes, J., dissenting) (referring to a "formulation contained in the Third Restatement [§ 2] *and its commentary*" (emphasis added)); *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.*, 69 Wis. 2d 326, 331, 230 N.W.2d 794 (1975) (relying on comments to Restatement (Second), § 402A). In sum, while our analysis must be driven by the statutory language, the accompanying commentary attached to the specific Restatement section language adopted by the legislature provides context to aid in interpretation; the Restatement comments give special definitional meaning to the language in the Restatement sections adopted in § 895.047. *See State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶¶45-46, 271 Wis. 2d 633, 681 N.W.2d 110.

¶23 We now summarize aspects of pre-Act 2 common law history to provide context. In 1967, our supreme court adopted § 402A of a then newly revised Restatement (Second) of Torts. *Horst v. Deere & Co.*, 2009 WI 75, ¶22, 319 Wis. 2d 147, 769 N.W.2d 536 (citing *Dippel v. Sciano*, 37 Wis. 2d 443, 155 N.W.2d 55 (1967)).[5] This "creat[ed] a new category of tort claims—strict products liability." *Id.* Under the common law, a manufacturer could be held strictly liable for a defective product—even absent a showing of negligence or other fault—to satisfy the three goals of shifting costs from injured parties to manufacturers, accomplishing more "fundamental fairness to the injured person,"

---

[5] Entitled "Special Liability of Seller of Product for Physical Harm to User or Consumer," section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

RESTATEMENT (SECOND) OF TORTS § 402A (AM. L. INST. 1965) (June 2021 Update).

and creating a "strong incentive" to deter the manufacture of dangerous products. *Id.*, ¶¶21, 24-26.[6]

¶24   More specifically, in defining whether a product has a design defect, our supreme court followed the Restatement (Second) standard: "the consumer-contemplation test" (sometimes referred to as the consumer-expectations test). Under this test,

> "*whether a product contains an unreasonably dangerous defect depends upon the reasonable expectations of the ordinary consumer concerning the characteristics of this type of product*.   If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, it would not be

---

[6] Under the pre-Act 2 common law approach, the *Dippel* opinion established a five-part test to prove strict product liability:

> (1) that the product was in defective condition when it left the possession or control of the seller,
>
> (2) that it was unreasonably dangerous to the user or consumer,
>
> (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages,
>
> (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and
>
> (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it.

*Horst v. Deere & Co.*, 2009 WI 75, ¶22 n.6, 319 Wis. 2d 147, 769 N.W.2d 536 (quoting *Dippel*, 37 Wis. 2d at 460).   Later, the court favorably cited five nonexclusive factors to consider in determining whether a product is defective and unreasonably dangerous, quoting a federal appellate decision applying Wisconsin law. *See Sumnicht v. Toyota Motor Sales, U.S.A., Inc.*, 121 Wis. 2d 338, 372, 360 N.W.2d 2 (1984) (quoting *Collins v. Ridge Tool Co.*, 520 F.2d 591, 594 (7th Cir. 1975)).

> unreasonably dangerous and defective. This is an objective test and is not dependent upon the knowledge of the particular injured consumer."

*Green v. Smith & Nephew AHP, Inc.*, 2001 WI 109, ¶29, 245 Wis. 2d 772, 629 N.W.2d 727 (emphasis in original) (quoting *Vincer v. Esther Williams All-Aluminum Swimming Pool Co.*, 69 Wis. 2d 326, 332, 230 N.W.2d 794 (1975)).[7]

¶25 In 1998, however, the Restatement (Third) of Torts altered the proposed standards. *See Godoy v. E.I. du Pont de Nemours and Co.*, 2009 WI 78, ¶17, 319 Wis. 2d 91, 768 N.W.2d 674; *see also* RESTATEMENT (THIRD) OF TORTS §§ 1, 2(b). Under § 1 of the Restatement (Third), a seller of "a defective product is subject to liability for harm to persons or property caused by the defect." Under § 2, a plaintiff proves a design defect by satisfying a "risk-utility balancing test," which replaces the consumer-contemplation test of the Restatement (Second), although as referenced below a comment to the Restatement (Third) explains that consideration of what consumers contemplate regarding a product is a potentially relevant factor in the risk-utility balancing test. *See Horst*, 319 Wis. 2d 147, ¶27 & n.7 (describing § 2 of Restatement (Third) as a "risk-utility analysis"); RESTATEMENT (THIRD) OF TORTS, § 2 & cmt. f.

¶26 Under the risk-utility balancing test, the plaintiff must show that the foreseeable risks presented by a product design could reasonably have been

---

[7] *See* RESTATEMENT (SECOND) OF TORTS § 402A cmt. g (AM. L. INST. 1965) (a "defective condition" means "in a condition not contemplated *by the ultimate consumer*, which will be unreasonably dangerous to him" or her (emphasis added)); *see also id.* § 402A cmt. i ("unreasonably dangerous" means "dangerous to an extent beyond that which would be contemplated by *the ordinary consumer* who purchases it, with the ordinary knowledge common to the community as to its characteristics" (emphasis added)).

14

limited by the net utility and costs of an alternative design. The test provides in pertinent part:

> A product is defective when, at the time of sale or distribution, it … is defective in design …. A product:
>
> ….
>
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

RESTATEMENT (THIRD) OF TORTS § 2(b). "A risk-utility analysis requires a balancing of the risks and benefits of a product design 'in light of the knowledge of risks and risk-avoidance techniques reasonably attainable at the time of [product] distribution.'" *Horst*, 319 Wis. 2d 147, ¶27 & n.7 (quoting RESTATEMENT (THIRD) OF TORTS § 2 cmt. a).

¶27 Against this common law backdrop, the legislature in Act 2 made two primary choices pertinent here. First, it adopted the risk-utility balancing test from the Restatement (Third) to determine whether a plaintiff has established a product design defect, which explicitly requires consideration of "foreseeable risks of harm" and "a reasonable alternative design." *See* WIS. STAT. § 895.047(1)(a).[8]

---

[8] WISCONSIN STAT. § 895.047(1) provides in its entirety:

> **(1) Liability of manufacturer.** In an action for damages caused by a manufactured product based on a claim of strict liability, a manufacturer is liable to a claimant if the claimant establishes all of the following by a preponderance of the evidence:
>
> (a) *That the product is defective because it* contains a manufacturing defect, *is defective in design*, or is defective

(continued)

15

Second, it retained the "unreasonably dangerous" test from the Restatement (Second) to determine whether a plaintiff has established unreasonable dangerousness. *See* § 895.047(1)(b). We summarize in turn the design defect standard of paragraph (1)(a) and "unreasonably dangerous" standard of paragraph (1)(b).

¶28 Before doing so, however, we explain why we conclude that common law that is consistent with the statutory language enacted as part of Act 2 has survived the codification, so that prior Wisconsin common law decisions can

---

because of inadequate instructions or warnings. A product contains a manufacturing defect if the product departs from its intended design even though all possible care was exercised in the manufacture of the product. *A product is defective in design if the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe.* A product is defective because of inadequate instructions or warnings only if the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe.

(b) That the defective condition rendered the product unreasonably dangerous to persons or property.

(c) That the defective condition existed at the time the product left the control of the manufacturer.

(d) That the product reached the user or consumer without substantial change in the condition in which it was sold.

(e) That the defective condition was a cause of the claimant's damages.

Sec. 895.047(1) (emphasis added).

16

provide useful guides when the decisions are consistent with all statutory language. First,

> [i]t is axiomatic that a statute does not abrogate a rule of common law unless the abrogation is clearly expressed and leaves no doubt of the legislature's intent. Statutes in derogation of the common law are strictly construed. A statute does not change the common law unless the legislative purpose to do so is clearly expressed in the language of the statute. To accomplish a change in the common law, the language of the statute must be clear, unambiguous, and peremptory.

*Fuchsgruber v. Custom Accessories, Inc.*, 2001 WI 81, ¶25, 244 Wis. 2d 758, 628 N.W.2d 833 (citations omitted). Relatedly, the legislature "is presumed to act with knowledge of the existing case law." *See Czapinski v. St. Francis Hosp., Inc.*, 2000 WI 80, ¶22, 236 Wis. 2d 316, 613 N.W.2d 120. The situation here is different from that in which "the legislature changes the structure of a statute," which typically requires courts to "construe [the statute] anew." *See State ex rel. DNR v. Wisconsin Ct. of Appeals, Dist. IV.*, 2018 WI 25, ¶38 n.16, 380 Wis. 2d 354, 909 N.W.2d 114. While the legislature unmistakably requires in WIS. STAT. § 895.047(1)(a) that plaintiffs provide proof that was not required in Wisconsin common law, the statutory language does not suggest that other aspects of the common law are changed. That is, the legislature indicated in § 895.047, in multiple ways, that it intends to retain common law rules that it does not explicitly alter and to make targeted adjustments, not wholesale "structural" changes, to the common law standards. *See* WIS. STAT. § 990.001(7) ("A revised statute is to be understood in the same sense as the original unless the change in language indicates a different meaning so clearly as to preclude judicial construction.").

¶29 Second, in stating "[l]egislative findings and intent" regarding product liability law, the legislature provided that "it is in the public interest to

17

clarify product liability law, generally, and the application of the risk contribution theory of liability first announced by the Wisconsin Supreme Court in ***Collins v. Eli Lilly Co.***, 116 Wis. 2d 166, 342 N.W.2d 37 (1984), specifically, *in order to return tort law to its historical, common law roots*." WIS. STAT. § 895.046(1g) (enacted as part of the 2013 budget bill, 2013 Wis. Act 20, § 2318F) (emphasis added). The specific risk-contribution theory at issue in ***Collins*** and the related case, ***Thomas v. Mallett***, 2005 WI 129, 285 Wis. 2d 236, 701 N.W.2d 523, that is the primary focus of this statement has no bearing on the current appeal. Nevertheless, this statement of legislative policy announces a preference for preserving strict product liability doctrines developed in the common law that are consistent with statutory language.

¶30 We now turn to the significant changes in what a plaintiff must prove under the Restatement (Third) risk-utility balancing test to prevail on a claim of strict product liability for a design defect based on WIS. STAT. § 895.047(1)(a). To repeat, plaintiffs must prove "the foreseeable risks of harm" that "could have been reduced or avoided by the adoption of a reasonable alternative design," the omission of which "renders the product not reasonably safe." Sec. 895.047(1)(a). Under the prior, pure common law approach, "manufacturers of defective products [could] be liable for the injuries their products cause, *regardless of the care taken by the manufacturer or the foreseeability of the harm*." ***Godoy***, 319 Wis. 2d 91, ¶27 (emphasis added) (Justice A.W. Bradley, with two justices concurring and three justices concurring in result). Thus, for example, in ***Green*** our supreme court approved an instruction that the jury could deem a product to be defective and unreasonably dangerous based solely on consumer expectations, regardless whether its manufacturer knew or could have known about the risk of harm. ***Green***, 245 Wis. 2d 772, ¶¶18, 27-

18

35. Further, before Act 2, "although the feasibility of an alternative design [could] be considered when evaluating a design defect claim," such a design alternative was "not a requirement." *Id.*, ¶43 (citing *Sumnicht v. Toyota Motor Sales, U.S.A., Inc.*, 121 Wis. 2d 338, 370-71, 360 N.W.2d 2 (1984)). Requiring proof of a reasonable alternative design would add a "'considerable'" "'element of proof'" to the analysis" under the prior common-law standard. *Godoy*, 319 Wis. 2d 91, ¶43 (quoting *Green*, 245 Wis. 2d 772, ¶73).

¶31 According to commentary to the Restatement (Third), the factfinder applying the risk-utility balancing test may consider an extensive range of factors in determining whether an alternative design is reasonable and whether its omission renders a product not reasonably safe:

> The factors include, among others, the magnitude and probability of the foreseeable risks of harm, the instructions and warnings accompanying the product, and the nature and strength of consumer expectations regarding the product, including expectations arising from product portrayal and marketing…. The relative advantages and disadvantages of the product as designed and as it alternatively could have been designed may also be considered. Thus, the likely effects of the alternative design on production costs; the effects of the alternative design on product longevity, maintenance, repair, and esthetics; and the range of consumer choice[s] among products are factors that may be taken into account. A plaintiff is not necessarily required to introduce proof on all of these factors; their relevance, and the relevance of other factors, will vary from case to case.

RESTATEMENT (THIRD) OF TORTS, § 2 cmt. f. Notably, this nonexclusive list of potential factors includes, but is not limited to, considerations pertinent under the consumer-contemplation test.

¶32 As the Supreme Court of Iowa has observed in commenting on the risk-utility balancing test, by using a "foreseeable risks" standard regarding a

19

"reasonable alternative design" and what is "not reasonably safe" to determine a design defect, the test effectively relies on "negligence principles" even though the doctrine goes under the name "strict liability." *See* ***Wright v. Brooke Grp. Ltd.***, 652 N.W.2d 159, 168 (Iowa 2002) (quoting 2 Dan B. Dobbs, THE LAW OF TORTS § 353, at 977 (2001) (observing that "negligence or something very much like it is the test of liability when it comes to design and warning defects," as opposed to manufacturing defects, for which "strict liability is retained")); RESTATEMENT (THIRD) OF TORTS § 2 cmt. d (describing the risk-utility balancing test as "a reasonableness test"). This sharply contrasts with the traditional view of strict products liability. *See* ***D.L. v. Huebner***, 110 Wis. 2d 581, 610, 329 N.W.2d 890 (1983) ("At the heart of a negligence action is the actor's conduct. The focus in a strict liability case, on the other hand, is on the product itself, not on the manufacturer's conduct. In strict liability actions plaintiffs need not prove specific acts of negligence."). This is significant here, because "[n]egligence is ordinarily an issue for the fact-finder and not for summary judgment." ***Lambrecht v. Estate of Kaczmarczyk***, 2001 WI 25, ¶2, 241 Wis. 2d 804, 623 N.W.2d 751.[9]

¶33     Finally, regarding WIS. STAT. § 895.047(1)(a), we note that it uses the disjunctive "or" in referring to the potential reduction or avoidance of foreseeable risks. Therefore, it is not necessary for Murphy to prove that use of the jaw-style tongs to lift wooden utility poles would entirely eliminate alleged risks posed by use of the Dixie tongs.

---

[9] In contrast to design defect claims, WIS. STAT. § 895.047(1)(a) addresses strict product liability claims of *manufacturing* defects without appearing to incorporate these negligence concepts: "A product contains a manufacturing defect if the product departs from its intended design even though all possible care was exercised in the manufacture of the product."

¶34    WISCONSIN STAT. § 895.047(1)(b) requires a plaintiff to show that "the defective condition rendered the product unreasonably dangerous to persons or property." This language is absent from the Restatement (Third), but appears in the Restatement (Second). *See* RESTATEMENT (SECOND) OF TORTS § 402A(1) ("[o]ne who sells any product *in a defective condition unreasonably dangerous to the user or consumer ...* is subject to liability for physical harm" under specified circumstances (emphasis added)). Thus, beyond showing a product defect under paragraph (a), plaintiffs must show that the product was "unreasonably dangerous to" persons or property under paragraph (b).

¶35    Explaining this legislative choice further, WIS. STAT. § 895.047(1)(a) and (1)(b) retain a common law distinction noted by our supreme court:   "Determining whether a product is defective and whether a product is unreasonably dangerous are two separate inquiries." *Sumnicht*, 121 Wis. 2d at 367. As the court later explained, "defect and unreasonable danger are distinct elements to a claim in strict products liability," although under the pre-Act 2 law, "both elements [were] based on consumer expectations." *Green*, 245 Wis. 2d 772, ¶29 (citing *Sumnicht*, 121 Wis. 2d at 367-70). This is consistent with the approach in the Restatement (Second), to the extent that § 402A requires a plaintiff to prove that the product was both in a defective condition and also unreasonably dangerous. *See* RESTATEMENT (SECOND) OF TORTS § 402A ("any product in a defective condition unreasonably dangerous").

¶36    Considered in isolation, the paragraph (1)(a) phrase "renders the product not reasonably safe" and the paragraph (1)(b) phrase "rendered the product unreasonably dangerous to persons or property" would appear to be synonymous (putting aside the reference to "property" that appears only in the latter, which does not appear significant to resolution of the summary judgment

21

decisions at issue here). *See* WIS. STAT. § 895.047(1)(a)-(b). But we interpret statutory language by giving "reasonable effect to every word, in order to avoid surplusage." *See State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110. Further, as noted, the phrase "unreasonably dangerous" does not appear in the Restatement (Third) but does appear in the Restatement (Second). Beyond that, shortly before the passage of Act 2, our supreme court explained that the Restatement (Second) standard was the "touchstone of our analysis for strict products liability." *Godoy*, 319 Wis. 2d 91, ¶18. For all these reasons, we construe the legislature as having intended to create in paragraph (1)(b) an "unreasonably dangerous" standard for plaintiffs to meet, additional to the requirement contained in paragraph (1)(a) of proving the product to be defective-by-design.

¶37 In seeking to give meaning to WIS. STAT. § 895.047(1)(b), we look to the following commentary in the Restatement (Second) that is consistent with pre-Act 2 Wisconsin common law: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." RESTATEMENT (SECOND) OF TORTS § 402A cmt. i.[10]

---

[10] Before Act 2, our supreme court on multiple occasions favorably quoted this portion of this comment defining "unreasonably dangerous." *See Vincer*, 69 Wis. 2d at 331; *see also id.*, at 331-33 (applying consumer contemplation test to conclude that, under an "objective" consumer viewpoint—a viewpoint that does not depend on "the knowledge of the particular injured consumer"—the dangers inherent in a swimming pool that lacked "a self-latching and closing gate" were obvious, and therefore the average consumer would be well aware of the risk of harm to unsupervised, small children when a ladder for the pool is left in a down position).

¶38    In concluding this summary of WIS. STAT. § 895.047, we note that, apart from adopting the risk-utility balancing test for design defect in § 895.047(1)(a), the statute appears to have largely retained standards similar to those under the pre-Act 2 approach to define the remaining elements that must be proven. *Compare* § 895.047(1)(c)-(e) *with **Horst***, 319 Wis. 2d 147, ¶22 n.6.  For example, the causation standard appears to remain the same.

### B.    WIS. STAT. § 895.047(1):  Design Defect Of Dixie Tongs

¶39    The parties' core arguments regarding the strict product liability claim address whether Murphy has failed to point to evidence that would be sufficient to meet the WIS. STAT. § 895.047(1)(a) and (1)(b) standards, as well as some argument regarding causation, which Murphy must show under paragraph (1)(e).[11]  The parties' primary dispute regarding the strict product liability claim is whether a reasonable jury could find that Murphy can rely on evidence that could satisfy the standards in § 895.047(1)(a), (b), (e).  We conclude that Murphy can point to sufficient evidence to support what amounts to a straightforward argument for liability under § 895.047, even if the evidence on some topics may not be robust.  We now summarize the relevant evidence.

¶40    Representations by Murphy's expert DeRosia included the following.  DeRosia is "a consulting biomedical engineer" and part-time medical

---

[11] CMC does not specifically argue that it is entitled to summary judgment based on any provision listed in WIS. STAT. § 895.047(3), which provides five defenses.  Separately, CMC may intend to make specific arguments based on passing references in its briefing to paragraphs (1)(d) and (1)(e), but it fails to develop standalone arguments for summary judgment on the strict products liability claim based on these specific references that are not addressed elsewhere in this opinion.

23

school researcher, with ten years of experience as an engineer in charge of construction operations for a utility company. He attained bachelor's and master's degrees in mechanical engineering and a doctoral degree in biomedical engineering, and has been a Wisconsin licensed professional engineer since 1985. He testified that he reached his conclusions "to a reasonable degree of engineering certainty."[12]

¶41    According to DeRosia, the pole that fell on Murphy was 30 feet long, with a butt-end diameter of approximately 9-1/4 inches and a top-end diameter of approximately 6-3/4 inches. It bore marks "that corresponded with the sharpened ends of pole lifting tongs" which Murphy attached "13 feet from the butt end of the pole," at a point "a little less than 6 inches from" the balance point of the pole when suspended. DeRosia opined that one mark on the pole appeared to be a vestige of a puncture by one tooth, and that on the opposite side was a spot where the other tooth "had ripped out of the wood of the pole, causing the pole to fall."[13]

---

[12] On the topic of DeRosia and his testimony, CMC presents arguments on appeal that appear to be based on the unstated assumption that the circuit court implicitly granted its motion to exclude DeRosia's testimony under WIS. STAT. § 907.02. But, as referenced above, the circuit court left unresolved the issue of admissibility of DeRosia's testimony under § 907.02. The court treated DeRosia's testimony as simply too weak, in the court's view, to support the arguments for liability made by Murphy. Thus, we are not reviewing a circuit court evidentiary decision, which is reviewed under the deferential erroneous exercise of discretion standard. *See State v. Dobbs*, 2020 WI 64, ¶27, 392 Wis. 2d 505, 945 N.W.2d 609. Instead, we determine whether CMC has shown that DeRosia's opinions could not be credited by a reasonable jury. *See Midwest Neurosciences Assocs. v. Great Lakes Neurosurgical Assocs.*, 2018 WI 112, ¶80, 384 Wis. 2d 669, 920 N.W.2d 767 (summary judgment should not be granted if a reasonable jury could return a verdict in favor of the non-moving party).

[13] It is undisputed that the pole that struck Murphy was an "old," "used" pole. DeRosia opined that the Dixie tongs are "unsafe to be used to lift wooden power poles, especially old, weathered or damaged poles."

¶42    We now summarize two of DeRosia's opinions in favor of liability, which we call "the tooth-configuration opinion" and "the clamping-force opinion." We conclude that the potential viability of either or both of these opinions is sufficient to create a genuine dispute of material fact.

¶43    DeRosia opined that, based on the configuration of its teeth, the jaw-style design is much safer than the Dixie tongs design, which is "a poor design choice." At least one tooth on each side of a set of pole-lifting tongs must remain embedded in the pole, or else "the tongs will no longer grasp the pole," and it "will fall with potentially dangerous consequences." Because the Dixie tongs have only one tooth on each side, if either fails to hold the pole, it will fall. Under this view, the Dixie tongs "can easily be dislodged from the items that they are attempting to lift," "even if attached properly." In contrast, the jaw-style tongs have "three sets of teeth on each side," and thus "do not share the single point of failure flaw." More specifically, DeRosia testified that he "would expect that the upper two teeth" of the jaw-style tongs would typically "share the load" (with "upper" teeth meaning those closer to the hinge that holds together the tongs' two steel members). This is so, DeRosia testified, based on the geometry of the teeth on the jaw-style tongs relative to the circumference of a wooden utility pole at the attachment points.

¶44    In addition to the number of teeth on each side of the jaw-style tongs, DeRosia called attention to the size and shape of the teeth, and expressed the view that they create more surface area between metal and wood than the Dixie tongs do, also helping to prevent a fall. He stated in one report:

> The effect is that each tooth [of the jaw-style tongs] offers a much larger line of contact rather than the single point connection of the Dixie tongs. Each line [of] contact tooth will distribute the load over a wider area so that more force

would be require[d] for the underlying wood to fail catastrophically.

¶45 The net result of the tooth-configuration, he opined, is that the jaw-style tongs "spread the load" in a way that the Dixie tongs do not, and it is "a lot harder to improperly place" jaw-style tongs compared with Dixie tongs. Before a pole could fall, multiple teeth, which have long "lines of contact" with the pole, must fail.

¶46 In testimony related to the tooth-configuration opinion, DeRosia opined that the jaw-style tongs have a safety advantage when a suspended pole "tilt[s]"—that is, when it meaningfully deviates from a suspended position parallel with the ground. When a suspended pole tilts, according to DeRosia, the jaw-style tongs "would stay at a right angle to the pole, maintaining a solid grasp," and provide a "stable, four toothed grip." In contrast, he opined, because the Dixie tongs have only one point of contact on each side of a pole, when the pole tilts, the teeth at their points of attachment would "rotate within the wood of the pole, weakening [their] engagement."

¶47 We now summarize DeRosia's clamping-force opinion. A set of jaw-style tongs has "sufficient clamping force to preclude the falling of [a] pole[] … to which it is affixed," in contrast to the Dixie tongs, which lack sufficient clamping force. This was based on a "kinematic analysis" of the "horizontal forces" at the primary points of attachment to a pole, for each of the two tong designs, as a result of the vertical force on the ring to which the tongs are affixed. DeRosia testified that, based on the assumption of the forces generated by the hypothetical lifting of a "580-pound, 30-foot, Class 5 pole," with a "6- to 7-inch diameter," he calculated that the jaw-style tongs clamp with four times more force than do the Dixie tongs.

¶48    Related to this clamping-force opinion, DeRosia took the position that the jaw-style tongs engage with a pole more fully than do Dixie tongs because (as CMC acknowledges) the jaw-style tongs are substantially heavier. This opinion starts from the following apparently uncontested details about how a line technician attaches both types of tongs to a pole in preparation for a lift: The technician creates slack in the winch line sufficient to pull the tongs apart, pushes the tongs down onto the pole as far as possible, and then raises the line, which brings the two sides of the tongs toward each other (in the manner of closing scissors), embedding teeth into wood. DeRosia opined that one advantage of the jaw-style tongs is that, when the worker pushes the tongs down onto a pole, the greater weight of the jaw-style tongs "would tend to push the tongs open completely, allowing the teeth of the tongs to engage fully" with the pole.[14]

¶49    We conclude based on the summary judgment record that either the tooth-configuration opinion or the clamping-force opinion could be credited by a

---

[14] Corroborating aspects of DeRosia's clamping-force opinion, a co-worker testified that at the time of the accident Murphy was lifting a relatively light pole that had a relatively hard surface. The co-worker suggested that the lighter a pole is, and the harder its surface, the less chance there is that the teeth of the Dixie tongs will become sufficiently embedded in the pole as the vertical force from the winch line is exerted. DeRosia estimated that the pole that fell on Murphy weighed "considerably less" than 600 pounds, and suggested that this is relatively light for a wooden utility pole.

Also potentially corroborating this opinion is a safety incident report prepared by the utility regarding the accident, which included photographic evidence and stated in part:

> The pole tongs that were being used to lift the poles were the single[-]point type that looks like the old style ice block carriers. The tong points had not penetrated the hard blackjack pole enough to hold when the weight was applied and movement then dislodged them. One tip penetrated about 3/8 inch in a crack and the other tip barely penetrated the pole.

reasonable jury, and that there would be nothing to prevent a reasonable jury from crediting both. Further, we conclude that either opinion alone, and certainly both opinions together, could support jury findings that the foreseeable risks of harm posed by the Dixie tongs could have been, at a minimum, reduced by adoption of the jaw-style tongs, which is a reasonable alternative design, and that the omission of the alternative design renders the Dixie tongs not reasonably safe. *See* WIS. STAT. § 895.047(1)(a). We also conclude that the evidence could support a jury finding that the defective condition rendered the Dixie tongs unreasonably dangerous to persons or property. *See* § 895.047(1)(b).

¶50 We now highlight the primary components of our analysis before addressing specific contrary arguments by CMC. Murphy can easily show that the *magnitude* of foreseeable risks of harm is high, given the obvious foreseeable risks involved in a 30-foot utility pole suspended from a pair of tongs falling from any height in close proximity to the extremities, torsos, and heads of workers, even putting aside the potential risk of unreasonable dangerousness to property. Further, under the consumer contemplation component of the risk-utility balancing test that may be considered as part of the test, *see supra* ¶32, CMC fails to explain why it should not be left to a jury to decide on the reasonable expectations of ordinary consumers regarding tongs used to lift or drag wooden utility poles in determining whether the proposed alternative design is reasonable and whether its omission renders the Dixie tongs not reasonably safe. *See **Hansen v. New Holland N. Am., Inc.**,* 215 Wis. 2d 655, 664-65, 574 N.W.2d 250 (Ct. App. 1997) (ruling that it was "a question of fact" to be determined by a jury whether the plaintiff's assessment that there was little or no risk in trying to cut hay from a hay baler was consistent with the assessment of an "average user" of a hay baler).

¶51     Notably, so far as the summary judgment record seems to reveal and the parties argue, the only significant disadvantage of the existing jaw-style tongs may be that their weight could render them less convenient to use (*e.g.*, more onerous for the technician to move from one spot on a pole to another for purposes of a balance test-lift—that is, a test lift to reveal tilt, lowering the pole back onto the ground, moving the tongs accordingly, etc.).  But if DeRosia's testimony is credited, the jaw-style tongs may be considered appreciably safer in part for that very reason.  Stepping back, assuming that a jury might consider the extra weight to be a meaningful disadvantage in balancing risk against utility, that calls for a jury determination by applying a broad range of potentially competing factors under the risk-utility balancing test and the "unreasonably dangerous" test.

¶52     Further, the jaw-style tongs design alternative offered by Murphy is not merely theoretical.  Under the commentary to the Restatement (Third) risk-utility balancing test, to prove a design defect a plaintiff need not produce an actual prototype of a reasonable design alternative, nor does a plaintiff have to show that the alternative design was ever adopted by a manufacturer or considered for commercial use.  *See* RESTATEMENT (THIRD) OF TORTS § 2 cmts. f, d.  Instead a plaintiff may rely on credible expert testimony that the alternative design could have been practically adopted as of the time of sale.  *Id.*  In contrast, "other products already available on the market … may serve as reasonable alternatives to the product in question."  *Id.*, § 2 cmt. f.  Here, Murphy can point to an actual alternative that has been manufactured and sold commercially.

¶53     At the same time, Murphy has relatively slim evidence on the specific issue of the *probability* of the foreseeable risks of harm posed by use of the Dixie tongs.  That is, apart from evidence that could support a finding that the rate of failure of the Dixie tongs might be higher than that of the jaw-style tongs,

Murphy's proof regarding the absolute risk of using the Dixie design is not strong.[15]  In particular, CMC emphasizes evidence that could support findings that the pole fell and injured Murphy on this occasion, not because the Dixie tongs are prone to failure, but instead due to his misuse of the tongs.  But the alleged misuse is not fatal to Murphy's strict product liability claim for at least two reasons.

¶54    First, the risk-utility balancing test calls for a broad assessment of many potential factors.  For this reason, a jury would be free to place less emphasis on the probability of foreseeable risks of harm compared with its emphasis on such other relevant factors as the alleged simplicity, certain safety, and consumer-friendly aspects of using the alternative jaw-style tongs design.  *See* RESTATEMENT (THIRD) OF TORTS § 2 cmt. f ("A plaintiff is not necessarily required to introduce proof on all of these factors; their relevance, and the relevance of other factors, will vary from case to case.").  Second, as we note in discussion below, there is evidence that poles have fallen from Dixie tongs with some regularity, albeit apparently not in situations in which anyone other than Murphy has been injured.

¶55    Turning to CMC's arguments, it contends that the tooth-configuration opinion is not sufficiently "scientific," is not the result of "tests" that DeRosia should have conducted, and is refuted by other evidence.  On the first two

---

[15] One federal district court judge interpreting WIS. STAT. § 895.047(1)(a) has observed that if the likelihood of failure of device A is .01 percent and for device B is .02 percent, then B is twice as likely to fail, but both may be deemed safe products and consumers are not likely to choose one device over the other based on the different failure rates.  *Joas v. Zimmer Inc.*, 218 F. Supp. 3d 700, 725 & n.13 (N.D. Ill. 2016).  While this hypothetical is helpful for our purposes, we note that it assumes very low risks of failure, which is an assessment that typically presents a jury issue.

points, we conclude that CMC fails to demonstrate that DeRosia's tooth-configuration argument could not reasonably be credited because DeRosia failed to perform a particular test. Without summarizing all of the details, DeRosia represented that he had consulted physical evidence and photographs, made calculations, reviewed the opinions of CMC's expert, and taken such steps as researching different types of "pole tongs that were available on the market." Further, the nature of his testimony primarily involves the application of what, so far as the summary judgment record and the arguments of the parties reveal, appear to be fundamental principles of mechanical engineering. CMC does not make a serious argument that these topics would normally be beyond the knowledge of someone with a doctoral degree in biomedical engineering, or that there is a fatal inconsistency or error in DeRosia's positions rendering them necessarily unworthy of belief.[16]

¶56 As for the contrary evidence regarding DeRosia's tooth-configuration opinion, CMC asserts the following: when a technician attaches the tongs to a pole lying on the ground, only one tooth on each side of the jaw-style tongs, the two closest to the ground, could possibly become embedded in the pole. But CMC fails to point to a place in the record establishing that this is necessarily the case. On this point, CMC cites to an affidavit of its expert, professional engineer John Green, who opined based on his measurements that, if Murphy had

_____

[16] CMC repeatedly references the fact that DeRosia supplemented his opinions multiple times as the litigation progressed, but it fails to develop a supported argument that anything about the supplementation renders DeRosia's opinions necessarily unworthy of belief, as opposed to merely subject to potential impeachment on cross examination and contradiction by opposing evidence. At least based on CMC's briefing on appeal, any alleged inconsistencies, withdrawn opinions, or incomplete initial opinions by DeRosia are not valid arguments for summary judgment.

attempted to attach the jaw-style tongs to the pole at the precise points where Murphy appears to have attached the Dixie tongs, then only one tooth on each side of the "jaw" would have contacted the pole. This evidence is limited in scope, and is not the definitive, unimpeachable position that CMC suggests. Putting aside DeRosia's differing view, Green did not purport to opine that the jaw-style tongs, when attached at any appropriate location for lifting on the pole, would necessarily, in all circumstances, have had only one tooth in contact on each side of a pole. Summary judgment is not appropriate to resolve this sort of "battle of the experts."

¶57    In addition, one of Murphy's co-workers supported DeRosia's tooth-configuration opinion by testifying that, when line technicians had previously and regularly used tongs with multiple teeth on each side to lift poles, the tongs had three or more teeth on each side, which "bit into the pole when you put it on the pole," depending on the diameter of the pole. He testified that, the greater the diameter of the pole, the more chance that the tongs could "have all three teeth on each side." The co-worker also testified that when line technicians attempt to attach a set of tongs to a pole,

> a lot of times you can look at [the tongs] and say that's not going to hold. That's not going to bite in there and hold, pick that [pole] up. You got to get [the tongs] down on the bottom side [of the circumference of the pole] more.

¶58    CMC further argues that the multiple teeth of the jaw-style tongs create their own safety risks, based on the testimony of a CMC employee that the additional points of contact on each side diffuse the clamping force, reducing it at each point of contact. The first problem with this diffusion concept as an argument for summary judgment is that DeRosia testified to the contrary, when he opined that the effect of forces diffused over multiple teeth was "trivial." Second,

32

CMC does not offer this argument as irrefutable evidence that a diffusion effect renders the jaw-style tongs less safe than the Dixie tongs. Indeed, the witness whom CMC now quotes did not indicate that this opinion was the product of anything resembling an objective test or based on accepted engineering principles.[17]

¶59 CMC briefly asserts that it is fatal to DeRosia's tooth-configuration opinion that it fails to properly account for the ways in which, according to CMC, Murphy was negligent at the time of the accident. This broad-brush assertion does not represent a developed argument. First, it is not clear how this argument about Murphy's alleged conduct is concretely tied to the terms of a provision in WIS. STAT. § 895.047. Second, CMC fails to account for competing evidence on these issues or to explain how a reasonable jury would be obligated to find that alleged product misuse by Murphy negates all relevant evidence provided by DeRosia. For example, a reasonable jury might find that even a pole that is raised relatively

---

[17] Because this testimony of alleged "additional hazards" posed by the jaw-style tongs was insubstantial, this undermines the only point that CMC purports to draw from one case it cites as purported persuasive authority. *See Kordek v. Becton, Dickinson & Co.*, 921 F. Supp. 2d 422, 430-33 (E.D. Pa. 2013) (relying on the Restatement (Third) risk-utility balancing test to rule that no reasonable jury could find that an alternative product design relied on by the plaintiff was a reasonable design alternative). But this authority is off point because CMC fails to direct us to the undisputed evidence of additional hazards posed by the jaw-style tongs that would be necessary in summary judgment analysis.

Similarly, also citing *Kordek*, CMC briefly notes that a manufacturer's instructions or warnings accompanying a product "should be considered in evaluating design defect claims," but it fails to develop an argument for summary judgment based on this proposition. Murphy testified that he was aware of "[i]nstructions for use of timber lifting tongs" that accompanied the Dixie tongs, which included the following: "[b]alance and control load carefully while lifting and lowering" and "[d]o not use 'lifting tongs' for lifting over people." This may be relevant evidence on various issues at trial, but CMC fails to show how it could be dispositive evidence supporting summary judgment.

high in the air and that tilts relatively sharply should not fall from safely designed pole-lifting tongs, and might specifically find that DeRosia is correct that a pole subjected to the same circumstances would not fall from jaw-style tongs.

¶60 CMC fares no better in arguing that DeRosia's clamping force opinion is not adequately supported by "any tests." CMC fails to explain why the specific calculations DeRosia offered could not reasonably be found to be reliable and relevant here. A moving party does not prevail on summary judgment merely by speculating that an expert opinion relied on by the non-moving party *might be* conclusively undermined through empirical data or some form of testing that neither side has collected or conducted.

¶61 CMC points out that DeRosia acknowledged that he had not purported to determine the precise amount of clamping force that is "sufficient" to keep a pole from falling, and instead took the position that the sufficient force would be "somewhere between" the alleged four-to-one ratio of the clamping forces of the two designs of tongs. DeRosia testified that Murphy's accident itself provides adequate evidence that the force applied by the Dixie tongs is not sufficient, since in his view it malfunctioned on this occasion, and that this would not have occurred with the jaw-style tongs due in part to their greater clamping force (even putting aside the alleged greater gripping capability of the jaw-style tongs due to tooth configuration). DeRosia also testified that he had searched without success for industry standards regarding a "sufficient" clamping force in this context.

¶62 CMC's argument for summary judgment on this point fails because it does not explain why a reasonable jury could not credit DeRosia's opinion that one design is safer than the other based on his clamping force calculations merely

because DeRosia did not offer a separate opinion as to what specific amount of force would be sufficient to keep tong teeth of either design embedded in a pole. CMC appears to have identified a potential lack of precision in DeRosia's testimony that it might be able to exploit at a trial. But DeRosia was clear in expressing the conclusion, purportedly based on his calculations, that the clamping force of the jaw-style tongs was considerably stronger. If CMC intends to argue that a plaintiff must introduce evidence of "industry standards" on a topic of this kind in order to pursue a design defect claim under WIS. STAT. § 895.047, it fails to develop a supported argument. In addition, we see no reason, and CMC provides none, that the pre-Act 2 proposition that "'[e]vidence of a malfunction is one type of circumstantial evidence that can be used in establishing a defective condition'" should not continue to apply under the terms of § 895.047(1)(a). *See Sumnicht*, 121 Wis. 2d at 373 (quoted source omitted).

¶63    CMC also argues that, even if a jury could reasonably credit either or both the tooth-configuration and clamping-force opinions about alleged safety advantages of the jaw-style tongs, Murphy still lacks evidence that the Dixie tongs are "not reasonably safe." On this topic, CMC cites a federal district court opinion applying the risk-utility balancing test to grant a defendant summary judgment on a strict product liability claim based on an alleged design defect because the plaintiff produced no evidence that the challenged product was not reasonably safe. *See Varner v. MHS, Ltd.*, 2 F. Supp. 3d 584, 594-95 (M.D. Pa. 2014) (concluding that plaintiff successfully showed that a warning tag sewn into a strap used to lift weights on all four sides of its perimeter could be "a reasonable and seemingly cost-effective alternate design," but ruling that plaintiff failed to show that a strap lacking this form of warning was not reasonably safe). CMC merely references the holding in *Varner*, without developing an argument from it that

applies here, and the facts of *Varner* bear no obvious resemblance to the facts here.

¶64    Still, this may present a close question here based on, as referenced above, the relatively slim evidence in the summary judgment materials regarding the probability of foreseeable risks of harm. We interpret WIS. STAT. § 895.047(1)(a) to mean that "'a plaintiff cannot prevail in imposing strict liability [on the manufacturer] if the proposed design merely makes an already safe product slightly safer.'" *See Varner*, 2 F. Supp. 3d at 594 (quoted source omitted) (applying the risk-utility balancing test). There is evidence to support a jury finding that DeRosia falls short of showing that the Dixie design is not reasonably safe. However, we conclude that material questions of fact exist on this issue. Just as "summary judgment does not lend itself well to negligence questions," *Ceplina v. South Milwaukee Sch. Bd.*, 73 Wis. 2d 338, 342, 243 N.W.2d 183 (1976), the determination of whether evidence is sufficient to establish that a product is not *reasonably* safe calls for the weighing of many facts, including here all of DeRosia's testimony that a jury might credit, as we have discussed.

¶65    CMC makes a related argument based on WIS. STAT. § 895.047(1)(b), which as we have explained requires the plaintiff to prove "[t]hat the defective condition rendered the product unreasonably dangerous to persons or property." CMC contends that Murphy cannot demonstrate that a "defective condition" of the Dixie tongs "rendered" them "unreasonably dangerous to persons or property," for the sole reason that Murphy cannot point to evidence of another accident similar to Murphy's involving the Dixie design. CMC's contention is based on testimony by a CMC witness that the Dixie design has been used for "about a hundred and thirty years" without a record of a similar accident, and on the fact that DeRosia could not identify evidence of a similar accident.

¶66    On the other hand, another of Murphy's co-workers testified, with "pretty much certainty," that the Dixie tongs "come off poles more frequently than" the tongs with teeth configured as those on the jaw-style, with less margin for human error with the Dixie tongs. Another company employee testified that "it was not abnormal for a pole to slip through the pole tongs if it was not hooked properly," such as when the tongs were not "engaged around the pole, if it was just slightly on top of the pole, as it started to lift, it would get up six, eight, ten inches, maybe a foot, and slip and fall through the pole tongs." One worker testified that he had witnessed poles dislodging from tongs "a dozen times."

¶67    Whatever force CMC's argument about the absence of prior similar accidents might have at trial, it lacks merit as an argument for summary judgment. CMC posits that "evidence of a lack of prior incidents is relevant to the question of whether a product is 'unreasonably dangerous.'" It seems likely that evidence that there have been no similar accidents would be relevant at a trial, because whether CMC "was on notice of the alleged design defect is … central to the questions of foreseeability" under the definition of defect in WIS. STAT. § 895.047(1)(a) and also to the "breach of duty" required to show negligence. *See Trask v. Olin Corp.*, 298 F.R.D. 244, 264 (W.D. Pa. 2014) (ruling, based in part on interpretation of Restatement (Third) of Torts § 2, that plaintiffs in a strict product liability and negligence case based on theories of design defect were entitled to discover information regarding prior accidental discharge incidents as potentially probative of the manufacturer's ability to foresee the accident). However, CMC effectively asks us to leap from this proposition about relevancy to the conclusion that no product at issue in a strict product liability case could be found to be "unreasonably dangerous to persons or property" in a particular manner unless the plaintiff is able to point to evidence of a prior accident that

occurred in that same manner. CMC fails to cite a pertinent provision in § 895.047 or other authority that could require this leap.

### III. NEGLIGENT DESIGN CLAIM BASED ON JAW-STYLE DESIGN ALTERNATIVE

¶68 Murphy's negligence claim also depends on the jaw-style tongs as an allegedly safer design alternative. The parties dispute whether, based on the summary judgment record, CMC has shown that Murphy cannot prove that alleged negligence by CMC in failing to use the jaw-style tongs design outweighs alleged negligence by Murphy. While the relevant facts and components of the legal standards significantly overlap between the two claims, this issue is decided without regard to the standards in WIS. STAT. § 895.047. *See* § 895.047(6) ("This section does not apply to actions based on a claim of negligence ….").[18] Neither side develops an extensive argument on this issue. In any case, we conclude that CMC fails to show that this is the "extremely rare" negligence case in which it is apparent that no reasonable jury could allocate the comparative negligence even slightly in favor of one party, here Murphy. *See **Taft v. Derricks***, 2000 WI App 103, ¶25, 235 Wis. 2d 22, 613 N.W.2d 190.

---

[18] CMC does not argue that the circuit court cannot instruct the jury on both the strict product liability and negligent design claims, an opportunity for plaintiffs that existed in Wisconsin law at least predating Act 2. *See **Greiten v. LaDow***, 70 Wis. 2d 589, 603, 235 N.W.2d 677 (1975) (Heffernan, J., concurring) ("there may be recovery for the negligent design of a product even though it is not unreasonably dangerous in the [Restatement (Second) of Torts §] 402A sense"); ***Morden v. Continental AG***, 2000 WI 51, ¶42, 235 Wis. 2d 325, 611 N.W.2d 659 (noting that the court had declined to overrule ***Greiten*** despite critical commentary).

¶69 Before Act 2, our supreme court contrasted claims of strict product liability for design defects with negligence claims based on an alleged design defects:

> In a negligence action, [unlike in a strict product liability action], it is not necessary to show that the condition of the product reached the level of unreasonable dangerousness. In that respect, the plaintiff's required proof appears less onerous at first glance. On the other hand, under a negligence theory, a plaintiff will not prevail by showing only that a product was defective. The principles of negligence law hinge on a defendant's conduct, and therefore the plaintiff must show that the defendant was at fault.
>
> A negligence action requires the proof of four elements: "(1) A duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury."

*Morden v. Continental AG*, 2000 WI 51, ¶¶44-45, 235 Wis. 2d 325, 611 N.W.2d 659 (citations omitted). To establish that CMC owed a duty of care to Murphy, Murphy must show that there is evidence that could support a finding that CMC knew or, in the exercise of ordinary care, should have known, that the Dixie tongs posed a foreseeable risk of injury. *See id.*, ¶48.

¶70 Turning to pertinent comparative negligence principles:

> A plaintiff whose negligence is greater than the negligence of any defendant cannot recover damages for that defendant's negligence. WIS. STAT. § 895.045(1). Generally, the allocation of negligence is a question for the trier of fact. *Schuh v. Fox River Tractor Co.*, 63 Wis. 2d 728, 744, 218 N.W.2d 279 (1974). However, when it is apparent to the court that the plaintiff's negligence is, as a matter of law, greater than any negligence on defendant's part, it is the court's duty to so hold. *See id.*; *Gross v. Denow*, 61 Wis. 2d 40, 49, 212 N.W.2d 2 (1973); [*Johnson v. Grzadzielewski*, 159 Wis. 2d 601, 608, 465 N.W.2d 503 (Ct. App. 1990)]. *See also* § 895.045(1).

***Peters v. Menard, Inc.***, 224 Wis. 2d 174, 193, 589 N.W.2d 395 (1999).

¶71 We have explained that such a determination will be the exception:

> The instances in which a court may rule, as a matter of law, that the plaintiff's negligence exceeds the defendant's are extremely rare. *See **Huss v. Yale Materials Handling Corp.***, 196 Wis. 2d 515, 534, 538 N.W.2d 630 (Ct. App. 1995). "The apportionment of negligence is a matter that rests within the sound discretion of a jury based upon the inferences it draws from the evidence presented, together with its determination as to the standard of care required of the parties." ***Id.*** at 535. It is also the jury's province to fairly resolve conflicts in testimony and weigh the evidence. *See **State v. O'Brien***, 223 Wis. 2d 303, 326, 588 N.W.2d 8 (1999).

***Taft***, 235 Wis. 2d 22, ¶25.

¶72 In addressing this issue on appeal, CMC bases all of its arguments on Murphy's alleged negligent conduct and ignores its own alleged negligent conduct. CMC argues that a reasonable jury would have to find all of the following, and implicitly argues that these findings would necessarily outweigh any possible finding of negligence by CMC: Murphy failed to "properly attach" the tongs at the pole's balance point; he "failed to perform a test lift (or, if he did, he failed to make the necessary adjustments prior to the lift)" in order to lift it at the balance point; and he "then compounded his failures by lifting the unbalanced pole to a height of 15 [feet] to 20 [feet] while standing underneath the pole"—all of which alleged conduct was contrary to his training and what he should have learned from his experience on the job.

¶73 We agree with Murphy that each of these points is disputed, including the implied argument that a reasonable jury would have to find little or no negligence by CMC. Further, CMC's arguments fail to take into account the rule that, in a negligence action, "[t]he jury may also consider that the

manufacturer has a duty to foresee reasonable abuses of the product." *See Hansen*, 215 Wis. 2d at 667. Our supreme court applied this concept in *Schuh*, explaining that the plaintiff there "misus[ed]" a crop blower when he stood on the edge of its hopper portion, "using it as a perch," and therefore it was "necessary for the jury to determine whether the defendant [manufacturer] could reasonably foresee such misuse of its product." *Schuh*, 63 Wis. 2d at 742-43 ("'The issue is one of foreseeability, and misuse may be foreseeable.'" (quoted source omitted)). This "foreseeability of reasonable abuses" concept is yet another reason that summary judgment is not appropriate here, given the mixed testimony in the summary judgment materials about precisely how line technicians could and should use the Dixie tongs to load poles from the ground onto trailers.

¶74     We first address evidence cited by Murphy that provides a sufficient evidentiary basis for a reasonable jury to find limited or no negligence by Murphy, and then turn to CMC's failure to come to grips with evidence that could support a finding of negligence by CMC.

### A.     Failure To Find Balance Point

¶75     DeRosia reached the conclusion that Murphy attached the tongs "a little less than 6 inches from" the balance point.[19] According to DeRosia this divergence from the balance point required Murphy to apply approximately 16 pounds of downward force, an amount within his "normal capacity," to "the light end" of the suspended pole to keep it from tilting relative to the ground and to

---

[19] Murphy himself testified that it was his practice to perform test lifts and attempt to find balance points or at least come close. CMC does not dispute Murphy's testimony that he does not recall anything about the accident.

41

guide it toward the trailer. Pushing down on the lighter end of the pole in this manner would have been consistent with what Murphy "was told" to do in his job. In sum, DeRosia would testify that Murphy followed company policies, even though he missed the balance point by fewer than six inches according to DeRosia, because he could compensate by using a hand to push down on the higher end, keep the pole level, and guide it toward the trailer.

¶76 CMC argues that a reasonable jury could not credit DeRosia's opinions regarding the balance point issue by citing eyewitness testimony to the accident that it suggests renders DeRosia's balance point testimony "speculative misstatements."[20]

¶77 To establish causation, Murphy has the burden of showing that negligence by CMC was "'a substantial factor in producing'" his injuries. *See Morden*, 235 Wis. 2d 325, ¶60 (quoting *Nieuwendorp v. American Family Ins. Co.*, 191 Wis. 2d 462, 475, 529 N.W.2d 594 (1995)); *see also Sumnicht*, 121

---

[20] We briefly address what amounts to a separate argument by CMC regarding where Murphy attached the tongs on *the circumference of the pole* for purposes of getting a good grip, which CMC confusingly intertwines with the issue of how close Murphy came to finding *the balance point of the pole* for lifting purposes. CMC argues that "the evidence unequivocally demonstrates [that] Murphy did not properly attach the [t]ongs to the pole's balance point, allowing the pole to come free." However, the evidence found at the record citations that CMC provides as support for this argument do not involve the balance point issue. Instead, it addresses a separate issue involving Murphy's placement of the tooth points along the circumference of the pole, which could support the argument that, when Murphy attached the tongs to the pole lying on the ground, he failed to attach them as he allegedly should have within the third of the circumference closest to the ground. One problem with this as an argument for summary judgment, which is sufficient to reject it, is that CMC merely suggests, without proving, why a reasonable jury could not credit DeRosia's opinion that the contact points were in the bottom third of the pole's circumference. CMC asserts that photographs DeRosia relied on in reaching this conclusion are unreliable, but it fails to point to conclusive evidence that DeRosia's interpretation of the evidence and calculations are in error.

Wis. 2d at 357-58 ("'The phrase "substantial factor" denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense.'" (quoted source omitted)).

¶78    It is undisputed that the only eyewitnesses to the accident who could be identified were Katelynn Diske Kingsbury and Michael Murphy (no relation), who were both stopped in vehicles, waiting for traffic to clear as plaintiff Murphy tried to load the pole. A police report quotes Kingsbury as saying that, when Murphy tried to move the pole, "it seemed like [the pole] started to tip, so, [Murphy] put his hands on it to try to right it and it had then fallen off on him." By this account, the pole might have appeared to "start[] to tip" only after Kingsbury began watching, and also Murphy's "hands" on the pole might have had a chance of "right[ing]" it. But Kingsbury was further quoted as saying that "the hoist" "was probably about 15 to 20 [feet] in the air" before the pole fell. This could suggest, consistent with CMC's theory, that the pole was sharply tilting shortly before the accident, with the tongs well above the level of Murphy's head so that the lighter end extended higher above that, and heavier end angled down toward Murphy.

¶79    The police report quotes Michael Murphy as saying that "it appeared that [the pole] kind of tipped. It appeared that [plaintiff Murphy] had tried to steady it, or right it, and the pole had fallen out onto him." These statements might be interpreted to match some of those made by Kingsbury and arguably could support plaintiff Murphy's theories. However, a private investigator who followed up with Michael Murphy reported that he made additional statements that included the following. Because of the way the "grappler" was attached to the pole, this created "a weight distribution issue." Michael Murphy estimated that

the "grappler" was "15 feet off the ground," with the lower end of the pole at "about eye level" to the worker. The pole was "teetering," with the end closer to the ground starting to go upwards and the end further from the ground going downwards—that is, it was heading toward a position of being more level relative to the ground. The worker "stuck his arm up[,] probably out of reaction to stop the pole from teetering" and rising, in an effort to "try[] to control it." As this occurred, "the grappler let go and the pole fell down on top of" the worker, who did not have time to get out of the way.

¶80 This testimony from two eyewitnesses is ambiguous on potentially material facts that a jury could wrestle with.[21] Nevertheless, aspects of these accounts could provide reasonably strong support for findings that Murphy attached the tongs too far from the center of gravity, so that the pole tilted to a degree that (depending on the jury's view of all evidence) reduced the safety of loading the pole onto the trailer, and also that he raised the pole significantly higher than it needed to be. As to the effect of an alleged tilt, CMC's expert testified that, while it is "something you can't calculate," an "out-of-balance utility pole will impart dynamic loading at the point[s] of contact."

¶81 We assume without deciding that, as CMC argues, a reasonable jury would have to find that, shortly before the accident, at least part of the pole was well above the level of Murphy's head, that it was sharply tilting, and that these

---

[21] For example, CMC bases it arguments for summary judgment in part on a purported reconstruction of the position of the pole just before the accident, which appeared to reflect the pole with one end touching the ground and the other high in the air. But, as Murphy points out, a jury could reasonably find that, whatever else is true, the statements of both eyewitnesses may be hard to square with the proposition that one end of the pole was on the ground just before it fell from the tongs.

two anomalies resulted from Murphy's failures to find the balance point and to maintain the pole at a proper height. We agree with CMC that these assumptions would undermine DeRosia's opinion to the extent that one interprets his position to be that Murphy did in fact control the pole by applying approximately 16 pounds of downward force to the light end of the tilting pole, because under these assumptions Murphy would not have been able to reach the lighter, higher end.[22] Still, even with these assumptions, CMC fails to explain why the same jury that makes findings consistent with these assumptions could not also credit DeRosia's tooth configuration or clamping-force opinions and find that tong design defects were a substantial or even the sole cause of the accident. CMC cannot point to conclusive evidence that the tilt, assuming it occurred, was a factor in causing the accident.

¶82     For these reasons, it does not change the summary judgment result that CMC makes the related point that it could point to evidence that Murphy failed to find the balance point, or come closer to it, with a test lift. Assuming for current purposes that a reasonable jury would have to find that Murphy either did not attempt a test lift or performed a test lift inadequately or contrary to his training, CMC fails to explain why this would dictate a finding that the resulting

---

[22] We note, however, that if a jury were to credit aspects of DeRosia's testimony, it could find that Murphy reasonably believed, *at the time he began to lift the pole*, that he was acting in a safe manner even if the pole was not perfectly balanced, because he *anticipated* being able to apply some downward force to the light end of the pole and adequately control it in that manner. It would be a quintessential jury question to decide at what point a worker attaching the teeth of a set of tongs to a pole might have been negligent in assessing how perfectly balanced the pole needed to be before attempting to lift it and load it onto a trailer, particularly in light of testimony that line technicians lifting poles do not always find "a perfect balance," and sometimes need to compensate by putting a hand on a suspended, otherwise tilting pole.

tilt, or the elevation of a portion of the pole well above the level of Murphy's head, was a factor in causing the accident.

### B. Standing Directly Underneath The Pole

¶83 CMC does not dispute that a line technician lifting and loading a pole onto a trailer by him or herself is required to work in close proximity to the pole. More specifically, it does not dispute that "there are acceptable practices for [technicians] guiding poles" suspended in tongs by using their hands. But CMC contends that a jury would have to find that Murphy was negligent in making a "decision to position himself directly underneath the suspended load" at the time of the accident and that this represents irrefutable proof of negligence. This is significant, CMC contends, in part because the safety rule book for the power company provided that "[e]mployees shall not be under a suspended load" and Murphy testified that he knew before the accident that it was dangerous to be positioned under a suspended load. We conclude that there is conflicting evidence as to whether Murphy positioned himself directly below the suspended pole.

¶84 DeRosia testified to the opinion that Murphy was "within an arm's reach" of the pole at the time of the accident, but disagreed with the proposition that he was "directly underneath the pole." DeRosia based this testimony on the way the pole struck Murphy and the nature of his task. Further, neither of the two eyewitnesses to the accident are quoted as saying that Murphy stood directly underneath the pole, only that he ended up being struck by it as it fell. Beyond all that, CMC's expert answered "[t]hat's correct" to the following question: "So because of all those variables you can't determine Murphy's exact position at the time the [pole] came free, whether that was directly underneath or eighteen inches to the side. Correct?" On this evidence, it would be for a jury to carefully weigh

all relevant circumstances to determine whether Murphy was negligent in positioning his body as he did just before or at the moment of the accident, and if so, the degree of negligence.[23]

### C. CMC's Alleged Negligence

¶85     As noted, CMC does not even briefly support its request that we affirm summary judgment in its favor on the negligent design claim, based on our de novo review, by explaining why we should conclude that a reasonable jury could not find that its own negligence is greater than Murphy's negligence. CMC ignores the fundamental fact that it could prevail on summary judgment only by showing, based on the summary judgment materials, that negligence that could be proven on its part is clearly less than negligence that could be proven on Murphy's part.     For this reason, we could reject CMC's entire argument for summary judgment of the negligent design claim based on a lack of development. However, we merely take this failure into account in making an overall determination that CMC does not prevail on its argument that the negligent design claim must be dismissed on summary judgment.

¶86     Recapping some discussion above, if a jury were to credit either the tooth-configuration or the clamping-force opinions offered by DeRosia, and naturally even more so if it were to credit both, it could determine that CMC was

---

[23] For these reasons, we need not address a collateral issue disputed by the parties as to whether the suspended pole might have, to any appreciable degree, swung in the air in the manner of a pendulum due to movement of the boom. CMC argues that there is no evidence that any swinging motion occurred and that, therefore, the theoretical potential for a swinging motion could not undermine CMC's position that Murphy was standing directly under the pole at the time of the accident. But we have explained why the issue is disputed, even if one puts to the side the potential for any swinging of the pole on the winch line.

negligent in designing the Dixie tongs and that this was at a minimum a significant contributing cause of the accident. The fact that a reasonable jury could reject some or perhaps even all of DeRosia's testimony is not an argument for summary judgment, as CMC suggests.

¶87    Given the existence of the jaw-style tongs, one aspect of Murphy's negligence case that might be straightforward would be potential proof regarding "'the custom in the industry (what the industry was doing) and the state of the art (what the industry feasibly could have done) at the time' of the design or manufacture," allowing the jury to "make the determination whether the manufacturer reasonably and economically could have chosen" to produce something resembling the jaw-style tongs instead of the Dixie tongs in the interest of safety. *See Morden*, 235 Wis. 2d 325, ¶56 (quoted source omitted). That is, Murphy's proof might not need to be particularly complicated regarding the risk-benefit analysis when comparing production and sales of the Dixie tongs with production and sales of an existing, somewhat similar product, because Murphy can offer evidence that the jaw-style tongs design is technically feasible and practicable in terms of cost and the over-all design and operation of the product.

¶88    CMC emphasizes evidence that it submits would support a finding that Murphy was aware at the time of the accident that using Dixie tongs as part of this task presented an "open and obvious danger." *See Kloes v. Eau Claire Cavalier Baseball Ass'n*, 170 Wis. 2d 77, 86, 487 N.W.2d 77 (Ct. App. 1992) ("where a plaintiff voluntarily confronts an open and obvious danger, his negligence, as a matter of law, exceeds any negligence attributable to the defendant(s)"). One problem with this as an argument for summary judgment is that CMC fails to take into account our explanation that the common law "open and obvious danger" rule is a rule "of limited applicability," which "should be

48

used only in cases where a strong public policy exists to justify such direct abrogation of comparative negligence principles." *See Hansen*, 215 Wis. 2d at 668. As we have explained:

> The rule has been applied under very limited circumstances and only where there is a high degree of probability that the condition or danger confronted will result in harm. *See Scheeler v. Bahr*, 41 Wis. 2d 473, 480, 164 N.W.2d 310 (1969) (danger is likely to be encountered by plunging headfirst into the unknown depths of a murky lake); *Schilling v. Blount, Inc.*, 152 Wis. 2d 608, 616-17, 449 N.W.2d 56 (Ct. App. 1989) (inherent danger of a loaded pistol that is cocked); [*Griebler v. Doughboy Recreational*, 160 Wis. 2d 547, 559-60, 466 N.W.2d 897 (1991)] (diving headfirst into a pool of unknown depth).

*Kloes*, 170 Wis. 2d at 87.

¶89    Further, CMC fails to develop an argument that is focused on evidence that Murphy was or should have been aware of "open and obvious" dangerousness specifically associated with potential failure of the Dixie tongs, as opposed to other risks associated with other pieces of equipment or aspects of the potentially perilous mechanics of lifting a 30-foot utility pole by oneself from the ground approximately six feet into the air to get it onto a trailer. As our discussion above reveals, the conflicting expert testimony regarding the reasons that one tooth of the Dixie tongs apparently tore loose from the pole here involves a measure of common knowledge and common sense, but also consideration of testimony regarding principles of mechanical engineering. CMC fails to show that a line technician in Murphy's position would have had specific reason to doubt the ability of both teeth of the Dixie tongs to hold under a wide range of foreseeable circumstances, including when (for whatever reasons a jury might determine) a pole is suspended higher in the air, or tilts at a sharper angle relative to the ground, than the technician might reasonably have anticipated.

## CONCLUSION

¶90    For all these reasons, we affirm the circuit court's ruling in favor of CMC regarding the purported sling- or choker-style design alternative, reverse the order granting summary judgment to CMC and dismissing both of Murphy's claims, and remand for further proceedings.

*By the Court*.—Order affirmed in part; reversed in part and cause remanded for further proceedings.